Stillman B. Jamieson, Defendant in Error, v. Robert S. Iles and Robert D. Martin, Plaintiffs in Error.

Gen. No. 25,325.

1. PARTNERSHIP, § 78*—*when partner is not entitled to compensation.* One of the members of a partnership of lawyers formed to prosecute suits for the collection of forfeited taxes and divide the fees was not entitled to profit from services rendered by the defendants subsequent to the date of a certain settlement, where he rendered no services whatever save as he helped to obtain the retainer of one of the defendants by the county board before the formation of the partnership.

2. CONTRACTS, § 139*—*when contract has illegal object.* No obligation attached to a promise of compensation for influence or help in obtaining from a public body, such as the county commissioners, a retainer as its attorney to render certain specified legal services.

3. CONTRACTS, § 139*—*what contracts are void as against public policy.* All agreements for pecuniary consideration to control the business operations of the government are void as against public policy without reference to the question whether improper means are contemplated or used in their execution.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

4. CONTRACTS, § 161*—*who may assert illegality of contract.* Where the illegality of a contract appears, it is of no importance whether such illegality be set forth by plea or allegation of the defendant, as it is the duty of the court both at law and in equity on grounds of public policy to repel plaintiff and refuse its aid to sustain the contract.

Error to the Circuit Court of Cook county; the Hon. FREDERICK A. SMITH, Judge, presiding. Heard in this court at the October term, 1919. Reversed and remanded with directions. Opinion filed November 4, 1920.

PETER J. HOWER, for plaintiffs in error.

J. HENRY NISSEN, for defendant in error.

MR. PRESIDING JUSTICE TAYLOR delivered the opinion of the court.

The complainant's cause of action is set forth in an amended bill of complaint which was filed in the circuit court on December 3, 1910. The substantial allegations are that the County Board of Cook County on January 2, 1900, gave a contract to the defendant Iles, whereby it authorized him to collect certain forfeited taxes and receive as his fees one-fourth of what was recovered; that the complainant and the defendants entered into a written agreement of copartnership, the sole business of which was the collection of forfeited taxes pursuant to the Iles contract of January 2, 1900; that a large number of suits for taxes were begun and that since May 1, 1904, a number of the claims covered by suits pending upon that date have been paid in and a large sum realized as fees for legal services; that according to the agreement of January 2, 1900, the complainant is entitled to one-third of such fees; but that the defendants refused to account therefor. The prayer is for an account of what has been done in the copartnership matter since

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

May 1, 1904, and for a decree to pay what may be shown to be due.

The defendants filed certain demurrers, which were overruled, and on January 28, 1911, filed certain pleas which, also, were overruled. On November 15, 1911, the defendants, pursuant to leave, filed an additional plea, that set up abandonment of the partnership on May 1, 1905, by the complainant, and a dissolution and settlement.

On November 15, 1911, there was a trial before the chancellor of the issues which were precipitated by the amended bill of complaint, an answer and certain pleas of the defendant, and on December 12, 1911, the chancellor entered an interlocutory decree. That decree recited: (1) That the cause came on to be heard on the second amended bill of complaint, the answer, three separate pleas of the defendants, the replication of the complainant, and upon proofs and exhibits taken in open court, and that the court finds:

(2) That the pleas are not sustained and are all overruled; that the equities are with the complainant; that he is entitled to a dissolution of the partnership mentioned in the bill of complaint and an accounting as prayed for in the second amended bill of complaint.

(3) That by the written agreement of January 9, 1900, the parties entered into a partnership agreement as set forth in the amended bill; that the said agreement is still in force and effect; that up to June 7, 1905, the receipts and disbursements of the partnership had been settled between the parties by an account stated and settled, except as to certain minor matters.

(4) That the complainant is entitled to an accounting from both of said defendants for all moneys received and disbursements made by them since June 7, 1905, for legal services rendered in connection with the law business covered by said partnership agreement.

The interlocutory decree ordered that the pleas be overruled and the cause referred to Master in Chancery Rogers to take a mutual account of all dealings and transactions between the complainant and the defendants in said cause from June 7, 1905, and all moneys received and disbursements made by the defendants for legal services rendered in connection with the law business covered by said partnership agreement, etc.

Pursuant to the order of reference, the parties introduced evidence at various hearings before Master in Chancery Rogers, and in the course of the taking of testimony before him, evidence was introduced concerning the origin of the contract of January 2, 1900, with the county board, it being claimed by the solicitors for the defendants that they were entitled to offer evidence to show that the contract to pay the complainant one-third of the fees to be recovered under the contract with the county board was illegal. The master, after certain evidence on that subject was introduced, ruled that under the order of reference he had no authority to pass upon that question and, upon March 23, 1914, a motion was filed by the solicitors for the defendants which recited that they would ask the court to define more specifically the duties of the master under the order of reference and, also, that they "the defendants, be permitted to file an amended plea herein setting up the illegality of the contract sued upon or that this suit be dismissed," etc.

The reason assigned for the illegality was that it appeared upon the face of the record that the contract sued upon was contrary to the public policy of the State; that "it appears upon the record that said contract is contrary to public policy because the consideration thereof so far as the complainant, Jamieson, was concerned was in whole or in part the procurement of the acceptance, by the Board of County Commissioners of Cook County, of the proposition by

Robert S. Iles to said County Board for the performance of personal services for the County of Cook in the State of Illinois for a certain consideration"; that the contract was for the division between the parties of fees to be earned by Iles "in the performance of services of a personal nature in an official or *quasi* official capacity for the County of Cook"; that the contract was contrary to public policy, etc.

Although we do not find in the abstract or record any express order of the court overruling the motion, we are entitled to assume from the recitation in the certificate of April 17, 1914, that the motion was heard and overruled.

Master in Chancery Rogers having died the cause was referred to Master in Chancery Mason. Evidence was taken before the latter, and on October 23, 1915, his report was filed recommending that a decree be entered in favor of the complainant against both the defendants in the sum of $3,913.37, and against the defendant, Martin, for the additional sum of $83.33.

On December 18, 1918, a final decree was entered which recited that the "cause coming on to be heard upon the bill of complaint as twice amended, the joint and several answers and the three separate pleas of the defendants (heretofore overruled by the court) and the replication of the complainant thereto and upon the report heretofore filed herein" of the master in chancery, the report of the master is approved, and it then decreed that the complainant recover of the defendants $3,913.37 with interest at 5 per cent from October 9, 1916, and the further sum of $83.33 with 5 per cent interest from April 11, 1914, from the defendant Martin. It also found that the complainant was entitled to one-third of the net fees when collected in certain pending and undisposed of cases.

Inasmuch as we are of the opinion that the determination of the question concerning the illegality of the contract is decisive of the cause, it follows that

it will be unnecessary for us to set forth here an analysis of or in any way consider the matters of account. Accordingly, we shall first refer to the evidence showing the origin of the contract with the county board and that between the complainant and the defendants, and then state the law applicable thereto.

A short time prior to January 2, 1900, the defendant Iles, a lawyer, undertook to obtain from the County Board of Cook County a retainer or contract for certain legal work, in connection with the foreclosure and collection of forfeited taxes, to be paid for on a percentage basis. On December 18, 1899, the County Commissioner Philip Knopf wrote to the Board of Commissioners of Cook County calling their attention to the fact that there were a large number of tracts of land which from year to year were forfeited to the State for nonpayment of taxes and from which no revenue was derived, and suggested to the board that foreclosure suits ought to be commenced in order to avoid the necessity of extending taxes and carrying them forward from year to year, and that as the work was of a special kind and outside of the County Attorney's usual duties, it ought to be done by a solicitor specially retained for that purpose who should be paid out of the proceeds of the suits.

On December 21, 1899, the defendant Iles wrote to the board of commissioners that he had prepared bills for the foreclosure of property forfeited to the State for nonpayment of general taxes under the statutes; that in his opinion such suits should be speedily prosecuted; that they would involve a large amount of litigation; that he would prosecute them to final decree and sale upon condition that he be allowed and paid as solicitor's fees a sum equivalent to one-fourth of all taxes, penalties, costs and fees recovered.

The evidence shows that the proposition made by the defendant Iles was opposed by Irwin, the president of the board, and that, although a majority of

the commissioners favored it, the president of the board could by his veto prevent its acceptance. Under the circumstances, the defendant Martin went to Jamieson, the complainant, and told him how the matter stood and that unless the opposition of Irwin was overcome the proposition of Iles would not be granted. Jamieson asked Martin, according to the testimony of the latter, ''what there would be in it for him if he could get sufficient political influence to get Mr. Irwin to agree to the acceptance of Iles' proposition.''

Martin further testified that he told Jamieson that Iles would take him in on a basis of giving him one-third of the proceeds of the collections if he would use his political influence to get Mr. James Irwin to agree to the proposition; that ''he said he had considerable influence; that his father was State Central Committeeman of the Republican party and also that he would in addition to his own influence get the influence of William Lorimer to get James Irwin to agree to the proposition''; that, ''if Mr. Iles would give him one-third of the profits he would get this influence to put the proposition through''; that he told Jamieson that ''Mr. Iles would agree to that and would enter into a contract in writing to divide the profits with him in return for the influence which he would furnish to get the consent of the President of the Board to the proposition''; that Jamieson told him that he went to James Irwin; that he also went to William Lorimer and that Lorimer ''requested Mr. Irwin to accept the proposition''; that as a result of these circumstances he, Martin, entered into the contract with Iles and Jamieson to give the latter one-third of the proceeds of the fees.

The evidence of the complainant is to the effect that Martin requested his assistance to obtain from the county board the contract which was subsequently entered into in the name of Robert S. Iles; that the latter was the one who conceived the idea and that he

had been unable to secure the contract from the committee; that for "that reason" they went to him, because he happened to be on friendly terms with a number of the county officials, and he succeeded in getting the contract from the county board; that contract being taken in the name of Mr. Iles, as shown in their written agreement.

On January 2, 1900, the County Board passed a resolution retaining Robert S. Iles as attorney and solicitor to prosecute to final decree and sale "foreclosure suits upon all lands forfeited  *   *   *  for nonpayment of general taxes, now subject to foreclosure under the statutes of Illinois, as the same now stand and appear upon the records of Cook County"; and that he be allowed the equivalent of one-fourth of all recovered as solicitor's fees, the balance to be paid into the county treasury.

On January 2, 1900, the complainant and the two defendants entered into a written agreement which, after reciting that they had that day "formed a partnership for the purpose of foreclosing the delinquent tax liens" provided that said contract with the County Board should be taken in the name of Iles and "be in trust for and inure to the benefit of the three parties  *   *   *  in equal proportion, that is to say, that the said three parties shall carry out the legal proceedings and that each of them shall pay one-third of all costs and expenses in connection with the foreclosure and in return each of said three parties shall receive for his own use and benefit one-third of a fee of twenty-five per cent of the proceeds," etc.

On March 12, 1901, the three parties entered into another written contract, which after stating that they were then engaged "in legal work in connection with certain foreclosures and have shared all expenses and profits equally," provided that certain rent and office expenses should be paid out of the proceeds of the tax foreclosing business and that if that was not sufficient

each should contribute equally to make up the deficit.

On December 9, 1902, the same parties entered into another written agreement which after referring to the two contracts of January 2, 1900, provided for the leasing of certain offices and for the payment of certain items of expense and charges which might arise in the conduct of the joint business. Although by that contract each of the three was to furnish his private office, it was provided that "out of the proceeds of tax collection business as far as possible" there should be paid $110 per month for rent; $45 per month for a stenographer; $25 per month for a clerk; $150 per year for telephone service and some other small items of charge.

Pursuant to their agreements the work was begun and carried on in the same suite of offices from May, 1900, until they separated in April, 1903. Complainant acted as treasurer and kept the books, signed all checks and had custody of the receipts and did some other work; Martin examined the claims of title on the tract indexes, etc.; and Iles selected the suits that were to be brought, and determined the parties that were to be sued and did the trial work if there was any contest.

About May 1, 1905, the complainant moved to other offices in the Ashland Block and the defendants took other offices in the Rector Building. The tax forfeiture business was then continued by the two defendants, the complainant taking no part in any of the work except that which pertained to the case of People v. Davis.

The evidence is conflicting as to just what transpired at the time of their separation. Martin states that they made an agreement of separation in the latter part of April, 1905, and that the complainant told him that if he was given the fee of a certain case that he had charge of and the defendants would pay the outstand-

ing overdraft that they, the defendants, could take all the other cases and that he would take the case that he was then working on and dispose of it; that he told complainant that was satisfactory; that he figured out how much the complainant's interest would come to on the books and paid him in cash out of his own pocket for his third interest; that he, Martin, and Iles then took over the files and the docket to their new offices in the Rector Building; that from that time on the defendants proceeded to dispose of the cases which they had on hand, paid whatever expenses were necessary and did all the work.

The evidence of the complainant is that he made a proposition to each of the defendants which was substantially to give each one of them a check for $1,000 and allow him, the complainant, to keep all the cases; that Martin said it was worth a great deal more; that he, the complainant, then offered to take $1,000 from each of them and let them retain the business; that that is the only conversation he had with them as to any settlement.

The evidence of Iles is to the effect that in a conversation with the complainant he told the latter that a fair way to do would be to take their account as it stood at that time, at the time of the separation, and allow him his just proportion of the amount that was due him at that time, that is, according to the statements of April and June, 1905; that the complainant said all right, "then make up a statement so I'll know what it is."

At the time of the separation there was pending a large number of the 800 suits which had been begun, and some work had been done on all of them.

The complainant claimed before the master that by the terms of the interlocutory decree he was entitled to one-third of all the fees derived from the tax foreclosures collected after June 7, 1905, and which were

partnership business, less certain items of expense, and the master so held.

It was claimed by the defendants that in case of an accounting, the complainant should be charged for part of the office expenses of the defendants which were incurred after the separation and that the defendants also should be allowed compensation for their services after the separation. The master held, however, that in the absence of a special agreement a partner cannot charge his copartner for his personal services in connection with the firm's business and, although, all the work was done by the defendants and none by the complainant, the latter is entitled to one-third of the net receipts.

The master stated the account as showing the balance due and unpaid the complainant—being one-third of the fees collected less certain limited expenses and less an overdraft of June 7, 1905, and three payments made to the complainant—as $3,913.37, and reported further that the complainant was entitled to one-third of the net fees when collected in certain pending and undisposed of cases. The final decree is substantially based upon the master's findings save that in addition it allows interest on both amounts.

By the writ of error herein prosecuted the defendants' claims are substantially as follows: (1) that the contract of January 2, 1900, between the complainant and the defendants created only a "working interest which ceased when he (complainant) ceased to work"; that, as, in the language of counsel for defendants: "There was a breach of the agreement by the complainant when he failed to render service jointly with the defendants to the conclusion of the cases in which fees sought to be accounted for were obtained, he is not entitled to an accounting as prayed for"; (2) that, as the contract of retainer was obtained through influence of the complainant with members of the county board in return for the promise of a share in

the profits of the retainer, the agreement of January 2, 1900, between the complainant and the defendants was illegal and void as against public policy.

It will be seen from the pleadings and evidence that the plaintiff asks to be allowed to profit from the services rendered by the defendants in certain cases since June 7, 1905, although he, himself, rendered no services whatever save as he helped to obtain the retainer of Iles by the County Board prior to January 2, 1900. The question arises, were the services the complainant rendered in regard to obtaining the retainer of Iles by the County Board a legal consideration sufficient to support a binding promise by the defendants to pay him one-third of the proceeds of the retainer.

It is the law that where one, by his influence or help, assists in obtaining from a public body or board such as the county commissioners, the retainer of another as attorney to render legal services and is promised compensation for such influence or help, no binding contract arises. In other words, no obligation attaches to a promise of compensation for influence or help in obtaining from a public body, such as the county commissioners, a retainer as its attorney to render certain specified legal services.

It is a high standard of ethics and does not yet obtain in the domain of general commerce where all the participants are engaged in business solely for private profit. But, from time immemorial, it has been the law as to all dealings with official representatives of the people. What the complainant did may have been entirely innocent and for the public good, but for fear that in rendering such services the temptation might induce evil doing, the law has deemed it wise to rule that such services may never be sufficient consideration for a promise to which a legal obligation attaches. There is not a scintilla of evidence that any wrongdoing was contemplated or occurred, but that does not change the rule of law nor avoid its application. As

the court said in *Powers v. Skinner,* 34 Vt. 274: "The law will not concede to any man, however honest he may be, the privilege of making a contract which it would not recognize when made by designing or corrupt men."

In *Providence Tool Co. v. Norris,* 2 Wall. (U. S.) 45, which was an action to recover on a contract to pay Norris a sum of money if he would procure a contract to furnish war supplies for the government, Mr. Justice Field said: "There is no real difference in principle between agreements to procure favors from legislative bodies and agreements to procure favors in the shape of contracts from the heads of departments. The introduction of improper elements to control the action of both is the direct and inevitable result of all such arrangements. * * * All agreements for pecuniary considerations to control the business operations of the government * * * are void as against public policy, without reference to the question whether improper means are contemplated or used in their execution. The law looks to the general tendency of such agreements; and it closes the door to temptation by refusing them recognition in any of the courts of the country."

In *Meguire v. Corwine,* 101 U. S. 108, the plaintiff brought suit on a promise by the defendant's testator to pay him one-half of all the fees which the testator should receive as special counsel, that promise having been made by the testator in consideration of the assistance to be rendered by the plaintiff in procuring for the testator his appointment as special counsel of the United States in certain litigated cases known as the "Farragut prize cases." In that case Mr. Justice Swayne used the following language:

"The law touching contracts like the one here in question has been often considered by this court, and is well settled by our adjudications. *Marshall v. Balti-*

*more & O. R. Co.*, 16 How. (U. S.) 314; *Providence Tool Co. v. Norris*, 2 Wall. (U. S.) 45; *Burke v. Child*, 21 Wall. (U. S.) 441; *Hall v. Coppell*, 7 Wall. (U. S.) 542. It cannot be necessary to go over the same ground again. To do so would be a waste of time. The object of this opinion is rather to vindicate the application of our former rulings to this record than to give them new support. · They do not need it. Frauds of the class to which the one here disclosed belongs are an unmixed evil. Whether forbidden by a statute or condemned by public policy, the result is the same. No legal right can spring from such a source. They are the sappers and miners of the public welfare, and of free government as well. The latter depends for its vitality upon the virtue and good faith of those for whom it exists, and of those by whom it is administered. Corruption is always the forerunner of despotism.''

In *Burke v. Child*, 21 Wall. (U. S.) 441, the court said: ''Within the condemned category are: An agreement—to pay for supporting for election a candidate for sheriff * * * ; to pay for resigning a public position to make room for another * * *; to pay for not bidding at a sheriff's sale of real property * * *; to pay for not bidding for articles to be sold by the government at auction * * *; to pay for not bidding for a contract to carry the mail on a specified route * * *; to pay a person for his aid and influence in procuring an office, and for not being a candidate himself * * *; to pay for procuring a contract from the government * * *; to pay for procuring signatures to a petition to the governor for a pardon * * *; to sell land to a particular person when the surrogate's order to sell should have been obtained * * *; to pay for suppressing evidence and compounding a felony * * *; to convey and assign a part of what should come from an ancestor by descent, devise, or distribution * * *; to pay for promoting

a marriage  *  *  *; to influence the disposition of property by will in a particular way.  *.  *  *''

Further, we are of the opinion that the motion of the solicitors for the defendants which was filed on March 23, 1914, requesting permission to file an amended plea setting up the illegality of the contract sued upon should have been allowed.

It makes no difference, in considering the matter before us, however, because it is the law that in case of an illegal contract, such as the one sued upon here, it is of no importance whether the illegality of the contract be set forth by plea or allegation by the defendant. As said in *Isler v. Brunson,* 6 Humph. (25 Tenn.) 277: ''It is the duty of either court (that is law or equity) on grounds of business policy to repel the plaintiff and refuse its action on his behalf.'' The court said in *Wilde v. Wilde,* 37 Neb. 891: ''It is a sufficient answer to this contention that courts will refuse their aid in enforcing similar claims, not on account of any solicitude for the parties, but as a duty they owe the cause of justice and the integrity of its courts. Whenever it is apparent that an agreement is contrary to business policy and sound morals, it will be ignored by the court, even though both parties should assent to its enforcement.'' Mr. Justice Cartwright said in *Pietsch v. Pietsch,* 245 Ill. 454: ''If a cause of action is such as no court would entertain, a court is bound to raise the question in the interest of due administration of justice and not for the benefit or in the interest of either party. Whether a claim of illegality is made by the pleadings or not, parties cannot compel a court to adjudicate upon alleged rights growing out of a contract void as against public policy or in violation of public law.''

For the reasons above set forth the decree is reversed and the cause remanded with directions to dismiss the bill of complaint for want of equity.

*Reversed and remanded with directions.*

O'CONNOR, J. and THOMSON, J., concur.