(No. 26866.—Judgment affirmed.)

BUTLER MANUFACTURING COMPANY, Appellee, *vs.* THE DEPARTMENT OF FINANCE, Appellant.

*Opinion filed May 20, 1943.*

George F. Barrett, Attorney General, for appellant.

Warrick, Koontz & Hazard, and Burrel Barash, for appellee.

Mr. Justice Murphy delivered the opinion of the court:

Appellee, Butler Manufacturing Company, filed with the Department of Finance a consolidated tax return under the Retailers Occupation Tax Act and included sales made by it in Illinois for the months of September, October, November and December, 1939. It claimed exemptions from taxable liability as to such business. The department amended the return and assessed a tax of $42,259.41 and added penalties of $10,564.84. Appellee gave notice of protest and a hearing was had under section 8 of the act. (Ill. Rev. Stat. 1941, chap. 120, par. 447.) The tax was confirmed and thereupon, at the request of appellee, the circuit court of Knox county issued a writ of *certiorari*

directed to the Department. After the filing of the writ setting forth all the proceedings had prior to the assessment of the tax, the court disposed of the case by the entry of a judgment finding that the return of the Department did not sustain the assessment and ordered "that said Writ of Certiorari be and the same is hereby sustained * * *" and "that the return of said Department of Finance to said Writ be and the same is hereby quashed." The Department has appealed direct to this court from such order.

There is no disputed question of fact. The issue is as to whether the sales reported by appellee were for use and consumption or for resale. The articles sold were metal grain bins to be used in connection with the "ever normal granary" plan evolved by the United States Department of Agriculture pursuant to Federal authorization. The sales were made by appellee to the Commodity Credit Corporation, which organization will be referred to as the credit corporation. It is contended on behalf of appellee that the credit corporation purchased the bins for resale to County Agricultural Conservation Associations. These associations will be hereinafter referred to as associations. The Department agrees that the sale was made to the credit corporation but contends it remained the owner and that the bins were devoted to its use and that any authority exercised over them by the associations was for and on behalf of the credit corporation. Such contentions necessitate a consideration of the purpose of the plan in the execution of which the bins were to be used, the method by which it was carried out and the legal entity of the credit corporation and associations and their relationship one to the other.

Appellee is organized under the laws of Missouri, has its principal place of business in Kansas City where it manufactures sheet metal products. In July and September, 1939, it submitted bids for the manufacture of two

classes of grain bins, one of the capacity of 1,630 bushels, the other of 2,169. Upon the acceptance of the July bid, appellee qualified under State law to do business in the State as a foreign corporation, leased an unused factory building in Galesburg, employed a large force of men and proceeded to filling the contract. The last shipment on the two orders was made October 20, 1939. It transacted no further business at this plant during that year and what it did in 1940 is not involved in this case.

The credit corporation was organized under the laws of Delaware pursuant to executive order and act of Congress. It issued stock which was held by the Secretary of Agriculture, had a board of directors and other corporate officers. Large sums of money were made available to it for the making of loans and in otherwise aiding in carrying out the plans embodied in the Agricultural Adjustment Act of 1938 and the Soil Conservation and Domestic Allotment Act. Having no purchasing agency of its own, the credit corporation used the Division of Purchases, Sales and Traffics of the United States Department of Agriculture, to secure bids on the bins in question. The engineers and other experienced employees of the Division of Purchases assumed full control of the preparation of the specifications of the bins, the submission of bids and all matters in reference to the bidding, but no bids were accepted by it except upon instruction and commitment from the credit corporation. The bins were paid for by the credit corporation by warrant drawn on the Treasury of the United States.

Pursuant to Congressional authority, certain corporations, associations and committees were authorized and empowered as instrumentalities in carrying out the purposes of the act. The area adapted to the production of a certain particular crop was divided into units, usually making a county a unit, and these areas into what is termed in the act as communities. Among the instrumentalities selected to aid in carrying the act into effect were county

committees organized as follows: The Secretary of Agriculture issued articles of association to the farmers of the various counties authorizing them to organize an association. The evidence is that practically every county in this State had such an association. The articles of association designated the name of the organization and the purpose for which it was organized, *viz:* to co-operate with the Secretary of Agriculture of the United States and other agencies of the Department of Agriculture in carrying out, in accordance with the applicable laws, regulations, rules and official instructions of the provisions of sections 7 to 17, inclusive, of the Soil Conservation and Domestic Allotment Act (Title 16), the Agricultural Adjustment Act of 1938 (Title 7), the Federal Crop Insurance Act, the Sugar Act of 1937, and any amendments to such acts and such other acts of Congress as the Secretary of Agriculture may designate. The association was prohibited from engaging in any other activity. The articles provided that any farmer who was participating or co-operating in any current program provided for in any of the acts was deemed to be a member of the association with power to vote at meetings of the community in which his farming operation was located. Failure to comply with the act terminated membership in the association. They authorized an election in the communities for the selection of community committeemen and the selection of delegates to the county convention. The delegates at the county convention selected what was termed a county committee consisting of three farmers who were members of the association and participating or co-operating in one or more of the programs described in the several acts mentioned. The articles prescribed the manner of calling the election, filling vacancies, the eligibility requirements to be a committeeman, the term of office, the power of removal and other matters pertaining to the internal affairs of the association, authorized the selection of a secretary to the county

committee and a treasurer, and prescribed their duties. They authorized the establishment of an office and required the keeping of books, records and documents pertaining to the business matters of the committee. Provision was made for meeting the expenses of the association by authorizing the county committee to deduct *pro rata* from any payments or loans made to members of the association in connection with any program under any act such expenses as had been first approved by the Secretary of Agriculture. The allotment of acreage for crops on any particular farm was fixed by the county committee and benefits under the act distributed by it were all subject to rules and regulations of the Secretary of Agriculture.

Although the several Congressional acts made provision whereby loans were made on at least seventeen farm commodities, the bins in question were purchased in reference to the loans on farm products produced in large amounts in this State, the principal one of which was corn. Prior to 1939, the loan features of the act had been administered by storing the corn which was to stand as security to the loan in privately owned bins on the farm or in the country elevators or public warehouses. The bounteous crops of several years created a surplus that used all such storage space. Farmer producers who had been furnishing their own storage delivered the corn on the credit-corporation loan and to prevent a large volume of corn being placed on the public markets at one time, the plan involving storage in steel bins was adopted. It appears from the record in this case that the primary use of the bins purchased from appellee was for the storage of corn which had been surrendered by the farmer producer to the credit corporation in liquidation of the loan.

Prior to the shipment of bins to any association, the credit corporation entered into a written contract with the association which provided that the credit corporation would order, purchase and deliver to the association bins for the

storage of grain acquired by the credit corporation in liquidation of the notes. The association agreed to erect the bins and pay all costs in connection therewith. It also assumed the duty of arranging for the delivery and storage of the grain taken by the credit corporation, to report amount stored, to bear the expenses of keeping the bins in good condition and, in the event the association recommended the grain be removed from the bins and the recommendation was concurred in by the corporation, the association agreed to pay the expenses incurred in transfer of such grain from the bin to cars or trucks. Section 4 provided that the credit corporation would allow the association three cents per bushel for the services rendered in connection with the corn which was stored in the bins. Section 5 of the contract contained the following pertinent provisions "Commodity [credit corporation] agrees to sell and the Association agrees to purchase all granaries delivered to the Association by Commodity under the terms of this agreement. The purchase price of such granaries shall be (a) the average delivered cost per bushel of all granaries purchased by Commodity and delivered under this and similar agreements, plus (b) the amounts advanced under section 4 hereof, plus (c) interest at the rate of four (4) per cent per annum on the amounts indicated in (a) and (b) hereof. * * *" The credit corporation agreed to advise the association by June 1, 1940, as to what would be the average delivered cost of the granaries. It then provided "Commodity agrees to apply in payment for said granaries charges for corn in storage at the rate of seven-twelfths (7/12) cent per bushel per month or part thereof; provided, that unless advised by Commodity to the contrary, said corn may remain in storage until October 1, 1941, without additional cost to Commodity." It also provided that if at any time when all or any of the granaries were utilized for the storage of corn, the association could complete the purchase by paying the credit corporation an amount equal to the difference between the

purchase price for said granaries as above determined and accrued storage charges for the corn stored as above provided. It further provided "At the request of the Association, Commodity agrees to transfer title to all or any of said granaries whenever the accrued storage charges for all corn stored by the Association equals the purchase for all or any of said granaries as above determined: provided, that on October 1, 1941, the sale shall be completed by the Association paying to the Commodity any difference between the accrued storage charges and the aggregate purchase price as above determined. After transfer of any or all of said granaries, the Association shall utilize the granaries in its possession pursuant to instructions issued by the Agricultural Adjustment Administration." The contracts were signed by the credit corporation and the association by the chairman of the county committee.

In addition to the income the association had from the storage of the grain in the bins, it had other means by which it collected fees and charges which became its absolute property. It employed its own help and paid its expenses from its own funds. It selected its own committeemen but the right was reserved to the Secretary of Agriculture to check its records, to control the amount of its general charges and to audit its accounts.

The members of the county committee who were the official representatives of the associations were not Federal officials in the sense that they were required to take oath and give official bond. It is true that their misconduct in office subjected them to removal by the Secretary of Agriculture and to prosecution under Federal statute, but nevertheless they were the chosen representatives of the farmers in the county who had elected to participate and co-operate in some parts of the farm programs outlined in the various Congressional acts.

In the Soil Conservation and Domestic Allotment Act, (Title 16, U.S.C.A., section 590h (b))provision is made for the Secretary of Agriculture to place the act in opera-

tion and in so doing he is "directed to utilize the services of local and state committees selected as hereinafter provided" and "the Secretary shall make such regulations as are necessary relating to the selection and exercise of the functions of the respective committees, and to the administration, through such committees of such programs." In sections 590(a) and 590(k) reference is made to the county committees and in section 590(k) it is provided that the funds available for carrying out the act shall be available for allotment "to committees or associations of producers in any region or regions to cover the estimated administrative expenses to be incurred by any such committee or association in co-operating in carrying out the act. Authority is also found in the Agricultural Adjustment Act of 1938 (Title 7, U.S.C.A.) for the Secretary of Agriculture to utilize the same county committees provided for under the Soil Conservation and Domestic Allotment Act, (Title 16).

It is apparent that these various provisions give to the county associations a certain legal entity with an existence separate and distinct from any other agency functioning under the Secretary of Agriculture or the Commodity Credit Corporation. The plan proposed by the various Congressional acts necessitated the creating of some character of organization with which the Secretary of Agriculture and the credit corporation might deal rather than to transact all business matters with each farmer who participated in the program. We recognize the general rule that an unincorporated association does not have legal existence, independent of the members who compose it, which will permit it to take title to personal property in its own name, but the right of such an association to take title to property in its own name may be authorized by statute. (7 C.J.S. 38.) In this case powers have been conferred on the county associations which carry the right to take title to personal property.

This brings us to a determination of the effect to be given the contract entered into between the credit corporation and the association in reference to said bins. Its terms are clear that the credit corporation agreed to sell and the county association agreed to purchase the bins. The price to be paid was fixed and the fact that the payment of the purchase price was to be taken from the earnings of storage charges is immaterial. The contract fixed all the essential terms to constitute a sale, and provision for delay in making payment and delivery of title would not operate to destroy the instrument as a contract of sale.

The Department terms the instrument entered into between the credit corporation and association as a "purported" contract and from this it argues that it was merely a matter' of form used in carrying out the program and was ineffectual to transfer the title to the bins from the credit corporation to the county association. In view of .the facts stated, we do not view the contract as one of mere form but an instrument sufficient in its terms to pass the title to the county associations.

Section 2 of the Retailers' Occupation Tax Act provides that a tax shall be imposed upon persons engaged in the business of selling tangible personal property at retail. The first paragraph of section 1 defines "sales at retail" to mean "any transfer of the ownership of, or title to, tangible personal property to the purchaser, for use or consumption and not for resale in any form as tangible personal property, for a valuable consideration." Under the views expressed, it follows that the credit corporation did not purchase the bins from appellee for use and consumption but that the purchase was for resale to the county associations. Under such circumstances appellee's business was not subject to the tax. *Material Service Corp.* v. *McKibbin,* 380 Ill. 226; *Mallen Co.* v. *Department of Finance,* 372 Ill. 598; *Superior Coal Co.* v. *Department of Finance,* 377 Ill. 282; *Bradley Supply Co.* v. *Ames,* 359 Ill. 163.

On this appeal the Department asks for alternative relief. It is contended that the trial court committed reversible error in not requiring appellee to present "its issues to the trial court to the end that they might have been lawfully reviewed as provided by the act." It is argued that for this reason the judgment should be reversed and the cause remanded for the entry of a judgment showing the specific points that have been judicially decided. It relies upon *Dubin* v. *Department of Registration and Education,* 380 Ill. 57.

Section 12 of the Retailers' Occupation Tax Act provides that the circuit and superior courts of the county wherein the hearing was held shall have power by writ of ·*certiorari* to review questions of law and fact determined by the Department. There is no provision in the act requiring the taxpayer to file a motion for rehearing specifying the points relied upon and the absence of this provision distinguishes the *certiorari* proceedings in this case from the *Dubin case,* [380 Ill. 57.] In that case the statute under which the *certiorari* writ was issued required the respondent in the hearing before the Department of Registration and Education to file a motion for new trial specifying the grounds for such motion. This difference in the statutes makes the holding in the *Dubin case* inapplicable to this case. Where a statute directs that a court may review by *certiorari* the record of a hearing conducted before an administrative agency the procedure to be followed and scope of court review is that which is authorized by the statute which grants the review. (*Dubin* v. *Department of Registration and Education,* 380 Ill. 57.) The record as presented on this appeal contained all that was necessary to present the issues that could be reviewed. The alternative relief prayed is denied.

For the reasons assigned, the judgment of the circuit court is affirmed.

*Judgment affirmed.*