(No. 33145.—■■■■■■■■■■■■■■■■■■

ELMER J. SCHNACKENBERG, Appellee, *vs.* ROLAND TOWLE, Appellant.

*Opinon filed November 18, 1954—Rehearing denied Jan. 18, 1955.*

562

MAXWELL, J., dissenting; KLINGBIEL, J., took no part.

CASSIDY, SLOAN & CASSIDY, of Peoria, (JOHN P. COGH-LAN, of Chicago, of counsel,) for appellant.

WILSON & McILVAINE, of Chicago, (CALVIN F. SELF-RIDGE, and GEORGE E. HALE, of counsel,) for appellee.

Per CURIAM: We have granted leave to appeal in this cause which involves a suit in chancery filed in the superior court of Cook County by Elmer J. Schnackenberg, appellee, against Roland Towle, appellant, for an accounting to recover two thirds of a $40,000 attorney fee paid appellant for services alleged to have been jointly rendered a foreign corporation in prosecuting a claim against the State of Illinois for a refund of certain taxes. It appears that the claim was prosecuted through the Department of Revenue, the circuit court of Sangamon County, this court and the United States Supreme Court, with all appearances being

made by appellant under a written agreement which provided that appellee would render all required service in handling the claim and that appellant would assist him. The circumstances under which the agreement arose need not be detailed in this opinion for they more fully appear in *Schnackenberg* v. *Towle*, 351 Ill. App. 497, 115 N.E. 2d 813.

The recital of the facts contained in the Appellate Court opinion is inadequate in one respect. By supplement we might add that the appellee, on June 6, when he received the letter from the Norton Company, the corporation involved in the tax claim, stated that the case would be handled the same as the "Tool and Die Workers case." In that case there was filed a claim against the Department of Revenue, the filing of an injunction, one court appearance, and an agreed decree. Contrary to the expectation of the parties hereto, the Norton case was not disposed of in the brief and simple way as contemplated. The appellant, in the prosecution of the Norton claim, performed all the services necessarily required before the Department of Revenue, the circuit court of Sangamon County, this court, and the Supreme Court of the United States. Appellee was not in a position to be of much assistance to appellant, and he contributed very little to assist in the labors and responsibilities of following the Norton litigation through all the courts of the land. The contract under scrutiny here was entered into with the firm belief that the Norton case could be settled quickly and profitably, just like the Tool and Die Workers case. But that is not what transpired. The Appellate Court, in its opinion in this case, states that the appellee fully performed his agreement with appellant, and that the latter seeks to avoid an accounting of the proceeds of the joint venture on the ground of illegality. This interpretation of the record reflects most unfavorably upon appellant. He is placed in the role of a welsher. A careful study of the record does not sustain such a conclusion.

Appellant admitted the fee-sharing agreement but de-

fended against it on the ground that it had been breached by appellee; that it was illegal and contrary to public policy in that appellee, a circuit judge at the time it was entered into, committed a breach of trust when he undertook, while in office, to perform legal services for a client whose claim was adverse to the interest of the State of Illinois; that appellee, as a circuit judge, is disqualified from practicing law; and that a judge of the circuit court is forbidden by statute from practicing law in any judicial circuit of this State.

The trial court found the issues for appellee and stated in a written opinion that *Town of Bruce* v. *Dickey,* 116 Ill. 527, and *O'Hare* v. *Chicago, Madison and Northern Railroad Co.* 139 Ill. 151, were determinative of the issue that appellee as a circuit judge was not prohibited from practicing law, except in the court in which he was commissioned, namely, the circuit court of Cook County. On appeal, the Appellate Court affirmed, its opinion stating that the public policy of this State with reference to judges practicing law was determined by the same cases. Our concern over questions relating to the rights and conduct of a circuit judge prompts our review of the case.

Appellee was undoubtedly practicing law while engaged in the joint retainer at a time when he was a judge of the circuit court of Cook County, and it would appear, from the terms of the agreement whereby he avoided personal appearances in connection with the claim, that he was at least apprehensive of some limitation on the extent to which he could pursue the matter. While it is true the *Dickey case,* decided in 1886, determined that there is no constitutional prohibition which bars a judge from practicing law, and that the *O'Hare case,* decided in 1891, established that a county judge was prohibited, under the existing statute, only from practicing law in a court in which he presided, we do not subscribe to the conclusion that the two cases are today determinative in the mat-

ters of public policy arising under the facts of this case.

There is no precise definition of public policy, and consequently no absolute rule of admeasurement, making it necessary to judge and determine each case, as it arises, according to its own peculiar facts and circumstances. It has often been said that the public policy of the State is to be found in its constitution and its statutes, and when cases arise concerning matters upon which they are silent, then in its judicial decisions and the constant practice of government officials. Courts will not look to other sources to determine the public policy of a State. (*First Trust and Savings Bank* v. *Powers,* 393 Ill. 97; *Zeigler* v. *Illinois Trust and Savings Bank,* 245 Ill. 180.) Looking to questions of contract generally, we have uniformly held that where a contract is illegal or against public policy a court of equity will not, at the instance of one of the parties who participates in the illegal or immoral intent, either compel the execution of the agreement or set it aside after it has been executed, because to give relief in such a case would injure and counteract public morals. The application of the rule is not in the interest of any party to the transaction but in the interest of the general public and, once the point appears, it is the duty of this court to apply the rule even though it is not urged by either party. (*Vock* v. *Vock,* 365 Ill. 432.) In view of the latter rule, our consideration is not confined to the isolated question of whether a circuit court judge may practice law, but must also extend to a determination of whether the agreement of the parties, under the circumstance that one of them was a judge, was so pregnant with evil as to be against public policy.

In the *Dickey case,* where the meager remuneration of the office was a definite factor, this court stated that while "Propriety may forbid a judge of the Supreme or circuit court from practicing law, as not being congruous with the judicial office, * * * we find no constitutional prohibition against it." Where, however, the remuneration is

generally deemed adequate, as is the case with judges of the Supreme Court and the courts of general original jurisdiction, and as may be the case with judges of other courts, inadequate remuneration no longer compels a deviation from propriety, or sanction of, a practice incongruous with the judicial office. When the reason for a rule disappears, the rule itself should disappear.

Again in the *O'Hare case,* although this court held that a county judge acting as an attorney did not, in that case, come within the statutory inhibition against practicing law "in the court in which he presides," it was stated: "The practice is one not to be commended, because of the tendency to bring the administration of the law into disrepute and contempt." We do not think that either result inferentially approves the practice of law by supreme or circuit court judges and certainly, since each was decided upon its own peculiar facts, they do not preclude this court, in a proper case, from imposing additional restrictions to prevent the practice of law and the courts of justice from becoming objects of scandal or suspicion. Apart from our decisions which have constantly striven to maintain the fidelity and integrity of the courts and the confidence of the public whom they serve in a position of trust, we think that the legislature, too, has manifested a changing policy since the advent of the *O'Hare* decision.

Immediately following that case, the legislature amended section 10 of the Attorneys and Counselors Act, which had formerly prohibited certain judges from practicing as an attorney "in the court in which he presides," to its present form which prohibits a judge of any court of record from practicing as an attorney "in the court in which he is commissioned or appointed." (Laws of 1895, p. 79; Ill. Rev. Stat. 1953, chap. 13, par. 10.) In its review of this cause, the Appellate Court interpreted the amendment as narrowing the statute to make it clear that the disqualification applies only to the particular court, as defined by territorial

boundaries, in which the judge is commissioned and has no application to courts where he might have presided, or could be called upon to preside, from time to time. However, when the amendment is measured in the light of this court's injunction that such practice, because of its tendency to bring the administration of the law into disrepute and contempt, was not one to be commended, it is difficult to conceive that the construction arrived at reflects the true legislative intent. In reaching its result the Appellate Court rationalized that the circuit court of Cook County was separate and apart from the other circuit courts of the State and that, since appellee was commissioned a judge of that court, the statutory inhibition extends only to prohibit his practice of law in that specific court. We, however, find but little justification for such a conclusion and think it manifest that such an isolated restriction was not intended by the legislature.

While the circuit court of Cook County may be territorially apart, it is still but a unit in the State-wide judicial system of circuit courts. One commissioned as a circuit judge is not confined to performing his office within the territorial limits of the circuit where elected but is expressly authorized, and sometimes required, to sit in other circuits within the State. (See Ill. Rev. Stat. 1953, chap. 37, pars. 72.29 and 72.30.) When he does so, he has all the powers of the regularly elected judges of the circuit. (*Jones* v. *Albee*, 70 Ill. 34, 40; *Pike* v. *City of Chicago*, 155 Ill. 656, 658.) These powers of interchange among circuit court judges existed when section 10 was amended in 1895 and the legislature is thus presumed to have known that the commission issued to a circuit judge qualified him to sit as judge in any circuit within the State circuit court system. Since the same evils would attend the judge's practicing law in any circuit where he was qualified to preside, we conclude that the legislative inhibition was directed to the broad aspects of his commission and was not intended

to apply only in the circuit from which he was elected. Thus construed, it is apparent that the decision in the *O'Hare case* is not presently determinative of the public policy with regard to judges practicing law and that, even in the absence of other considerations, appellee was disqualified from acting as attorney when the tax claim was prosecuted in the circuit court of Sangamon County.

A further crystallization of the changing legislative view on the question is found in section 10 of the act in relation to a municipal court in the city of Chicago. (Ill. Rev. Stat. 1953, chap. 37, par. 365.) In 1931, the section, which deals with the qualifications for judges of that court, was amended to provide that no judge shall, during the term of his office, "engage, either directly or indirectly, in the practice of the law." (Laws of 1931, p. 423-424.) While the prohibition therein is not conclusive as against judges of the circuit court, it represents the latest declaration of legislative policy on the subject that we have found and is persuasive, when the constitutional need for consistency in classifications is considered, that such a policy, as the most recent expression of the legislature, asserts its present view of the matter.

When the foregoing manifestations of the legislature are coupled with the judicial decisions of this court which have long maintained the policy that the integrity and honor of courts, and of lawyers, who are officers of the court, be maintained free from scandal or suspicion of improper conduct, we think it manifest that the agreement sued upon is, under the circumstances, contrary to the public interest and good. We are not limited to the narrow criterion of a specific decision in looking to the public policy applicable to such conduct of judges or other public officials. It is stated in 17 C.J.S., Contracts, sec. 212, that "A people can have no higher public interest, except the preservation of their liberties, than integrity in the administration of their government in all its departments."

Conversely, the governmental official holds a position of public trust, and his conduct is to be measured by the highest of standards. It has been with these principles in mind that this court has consistently looked with disfavor upon any conduct tending to bring our courts into public suspicion and disrepute. Thus in the *Dickey case* it was said that the judge's action of practicing law was a breach of propriety; in the *O'Hare case* we said it was a practice not to be commended because of its tendency to bring the administration of justice into contempt; in *Evans v. Funk,* 151 Ill. 650, 658, we condemned a county judge, before whom the estate was pending, for representing a client in a will contest in the circuit court, saying that our decision arose "from the strongest necessity of upholding the principles of public policy in maintaining the purity and honor of the courts of justice free from all scandal or suspicion of improper conduct on the part of the judges;" and, most recently, in *London & Lancashire Indemnity Co. v. Tindall,* 377 Ill. 308, this court expressed its displeasure at the name of a circuit judge appearing as of counsel on briefs filed in this court.

We agree with appellant that the policy of keeping our courts free from suspicion would be difficult, if not impossible, to maintain if this court gave judicial sanction to one whom the people have elected a judge, with Statewide power, to engage for personal gain in the partisan practice of law. While we entertain no doubts that appellee accepted his employment in complete good faith and that he did not use his office to further it, such circumstances do not change the fact that the agreement, and the manner in which it was carried out, was of a nature easily calculated to cause suspicion and distrust in the minds of the public and, in the hands of a less honorable person, could have resulted in public harm. The law, however, will not concede to any man, regardless of how honest he may be, the privilege of making a contract which it would not

570

recognize when made by designing or corrupt men. (*Jamieson* v. *Iles,* 219 Ill. App. 432, 443.) To the extent that *Town of Bruce* v. *Dickey,* 116 Ill. 527, and *O'Hare* v. *Chicago, Madison and Northern Railroad Co.* 139 Ill. 151, are in conflict with the views expressed in this opinion, they are expressly overruled.

We conclude, therefore, that the agreement contemplating that appellee, while holding the office of judge, should perform legal services on behalf of a client is, because of its tendency to bring the administration of justice into suspicion and disrepute, contrary to the public policy established by the judicial decisions of this court. Since this is so, and because it appears that the parties stood on equal footing in making the agreement, we will not, in the interest of the public, give relief to either party. *Vock* v. *Vock,* 365 Ill. 432.

The judgment of the Appellate Court for the First District and the decree of the trial court are reversed.

*Judgment and decree reversed.*

Mr. JUSTICE KLINGBIEL, took no part in the consideration or decision of this case.

Mr. JUSTICE MAXWELL, dissenting.