# Illinois Official Reports

## Supreme Court

---

### *1550 MP Road LLC v. Teamsters Local Union No. 700*, 2019 IL 123046

---

| | |
|---|---|
| Caption in Supreme Court: | 1550 MP ROAD LLC, Appellee, v. TEAMSTERS LOCAL UNION NO. 700, Appellant. |
| Docket No. | 123046 |
| Filed | March 21, 2019 |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Raymond W. Mitchell, Judge, presiding. |
| Judgment | Judgments reversed.<br>Cause remanded with directions. |
| Counsel on Appeal | Richard J. Prendergast, Michael T. Layden, Deirdre A. Close, Brian C. Prendergast, and Collin M. Bruck, of Richard J. Prendergast, Ltd., and Sherrie E. Voyles and Brandon M. Anderson, of Jacobs, Burns, Orlove & Hernandez, both of Chicago, for appellant.<br><br>Richard K. Hellerman, of Law Office of Richard K. Hellerman P.C., of Chicago, for appellee. |

Justices       JUSTICE BURKE delivered the judgment of the court, with opinion.

Chief Justice Karmeier and Justices Thomas, Kilbride, Garman, Theis, and Neville concurred in the judgment and opinion.


## OPINION

¶ 1        The Property of Unincorporated Associations Act (Act) (765 ILCS 115/2 (West 2010)) requires a labor union to notify its members and obtain their approval prior to entering into an agreement to lease or purchase real estate. At issue in this case is whether a union's failure to follow these requirements rendered a real estate agreement executed by its representative unenforceable. Applying the analysis set forth in *K. Miller Construction Co. v. McGinnis*, 238 Ill. 2d 284 (2010), the circuit court of Cook County concluded that the agreement is enforceable on the grounds that the Act is silent as to the consequences of noncompliance. The appellate court affirmed. 2017 IL App (1st) 153300. This court allowed defendant's petition for leave to appeal. Ill. S. Ct. R. 315(a) (eff. Nov. 1, 2017). For the reasons that follow, we reverse that part of the lower courts' judgments pertaining to the enforceability of the agreement and remand the cause to the circuit court with directions.

¶ 2                                    BACKGROUND

¶ 3        At the time of these events, Teamsters Local Union No. 726 (Local 726) was a voluntary unincorporated association chartered by, and a local affiliate of, the International Brotherhood of Teamsters. In 2009, Local 726 represented approximately 4500 members in the state of Illinois. On May 2, 2008, Thomas Clair, the secretary-treasurer of Local 726, signed and executed a lease and purchase agreement (LPA) on behalf of the union with plaintiff, 1550 MP Road LLC. The LPA was prepared by plaintiff's attorney and signed by two individuals— Clair and Matthew Friedman, one of plaintiff's managers.

¶ 4        The LPA obligated Local 726 to occupy and pay rent on commercial property at 1550 South Mount Prospect Road in Des Plaines, Illinois, for 15 years. The monthly base rent was $12,549 per month in the first year of the lease, gradually increasing to $16,559 per month in year 15 of the lease. In addition to the base rent, Local 726 was obligated to pay plaintiff an amount equal to the operating expenses incurred by plaintiff and the real estate taxes for each calendar year. The LPA functioned as a "lease" agreement only for the first five years. At the end of the fifth year, Local 726 was obligated to purchase the property for the amount of $2,145,371. If Local 726 failed to purchase the property within five years, it was required to pay plaintiff an amount equal to 200% of the base rent for the remainder of the lease term (double-rent penalty). This provision would require Local 726 to pay plaintiff approximately $3,583,000 over 10 years without obtaining title to the property.

¶ 5        The LPA also contained a liquidated-damages provision in the event of tenant default. Under this provision, if Local 726 defaulted by failing to pay rent, it would be liable to plaintiff in the amount of the total rent owed for the remainder of the lease term. The liquidated-damages provision did not require an offset for the fair-market rental value of the property. In other words, if the fair-market rental value exceeded the amount owed under the liquidated-

damages provision, plaintiff was not required to apply the excess value toward the amount owed by Local 726.

¶ 6    Pursuant to the LPA, Local 726 took possession of the property in January 2009 and paid rent until August 2009. At that time, Local 726 went into emergency trusteeship as a result of an investigation into its finances by the International Brotherhood of Teamsters (International). From September to November 2009, Local 726's trustees attempted to reach a new lease agreement with plaintiff but were unsuccessful. Local 726's last rental payment was made to plaintiff in December 2009 for the month of January 2010. In December, International voted to revoke the charters of Local 726 and Teamsters Local Union No. 714 (Local 714) and to charter a new union, Teamsters Local Union No. 700 (Local 700). Accordingly, on December 31, 2009, Locals 726 and 714 were dissolved, and Local 700 was chartered.

¶ 7    As of December 31, 2009, the membership rolls, assets, and liabilities of Locals 726 and 714 were transferred to Local 700. From January 1, 2010, to April 30, 2010, Local 700 occupied the property formerly occupied by Local 726. In February 2010, Local 700 proposed a "rent/standstill" agreement to plaintiff. Under the proposed agreement, Local 700 would occupy the property on a month-to-month basis and pay rent equal to the amounts set forth in the LPA, while plaintiff would not waive any of its rights regarding the enforcement of the LPA. Plaintiff never responded to that proposal.

¶ 8    On or about March 10, 2010, plaintiff began advertising the property to potential renters and/or buyers by placing a sign on the front lawn. On April 30, Local 700 vacated the premises and moved its operations to another property. On May 12, plaintiff served Local 700 with a notice of default demanding rent payments, real estate taxes, insurance payments, and late charges for the months of February through May 2010. When Local 700 failed to respond, plaintiff formally terminated the lease.

¶ 9    Plaintiff subsequently filed a 22-count verified amended complaint seeking damages related to Local 700's alleged failure to perform according to the terms of the LPA. Count I, the sole count at issue in this appeal, alleged breach of contract against defendant, Local 700.[1] The claim alleged that defendant was liable for Local 726's breach of the parties' agreement under a theory of corporate successor liability. Plaintiff requested damages under both the liquidated-damages provision and the double-rent penalty. The case proceeded to a bench trial in September 2014.

¶ 10   Clair testified that he worked for the City of Chicago for 28 years, retiring in 2003. His education consisted of two years at community colleges. In 1971, while working as a truck driver for the City, he became a member of Local 726. In 1995, he attained the position of business agent for Local 726, and in 1996, he became the recording secretary. In 2003, he was appointed as Local 726's secretary-treasurer, a position he maintained until his retirement from the union in 2009. Clair testified that he had no background in real estate. He testified that, as the secretary-treasurer and principal officer of Local 726, he had the authority to negotiate and sign leases on behalf of the union.

_____

[1]Counts II and III alleged violations of the Uniform Fraudulent Transfer Act (740 ILCS 160/5(a), 6(a) (West 2012)) against Local 700. The remaining counts alleged tortious interference with contract against various defendants not involved in this appeal.

¶ 11        Clair stated that he signed a lease renewal agreement for Local 726's former premises on December 30, 2003. That lease and the LPA were the only lease agreements he had signed for the union. Clair testified that, in late 2007 or early 2008, the union was in the market for new office space. He testified that he unilaterally negotiated the LPA with Friedman and Mick Bess, plaintiff's comanager. Clair admitted that he did not seek advice from an attorney or real estate agent during the negotiations of the LPA. He also admitted that Local 726's membership did not receive notification of the LPA before he signed it, nor was a vote taken of the members to authorize the agreement. Clair testified that he thought the members would be notified when it came time for Local 726 to purchase the property pursuant to the terms of the LPA.

¶ 12        Friedman testified that he had been involved in the construction and the commercial real estate and development industries since 1984. He had worked for two or three companies before starting his own company doing commercial development and construction. He testified that, over the course of his career, he had been involved in over 250 commercial real estate transactions. Friedman stated that he thought Clair had the authority to sign leases on behalf of Local 726. He testified that, following negotiations with Clair, he asked his attorney, Jeffrey Rochman, to draft a lease agreement memorializing the terms agreed to by the parties.

¶ 13        According to witness testimony, on May 8, 2008, six days after Clair signed the LPA, he met informally with some of the members of the executive board. No minutes were taken. At this meeting, five of the seven board members, including the president, signed a document titled "Unanimous Consent of the Executive Board in Lieu of Meeting of the Executive Board of Teamsters Local Union Number 726." The document was drafted by Rochman. It purported to authorize the union's secretary-treasurer, president, and/or secretary, acting together or alone, to lease the property at 1150 South Mount Prospect Road in Des Plaines, Illinois, from plaintiff. The document did not reference any specific terms of the LPA, nor did it mention Local 726's obligation to purchase the property. Michael Marcatante, a trustee of Local 726 who was present at the meeting, testified that he had not seen a copy of the LPA and was unaware of its terms before signing the document. He also was unaware that Clair had already signed the lease prior to their meeting.

¶ 14        Local 726's bylaws were entered into evidence. The bylaws stated, in relevant part: "[t]he principal officer, *** together with the President shall sign all official documents, deeds, mortgages, bonds, contracts, or other instruments, *** and perform such other duties as the International Constitution, these Bylaws or law may require of him." The bylaws also stated:

> "The Local Union Executive Board, in addition to such other general power conferred by these Bylaws, is hereby empowered to: *** (8) Lease, purchase or otherwise acquire in any lawful manner for and on behalf of the organization, any and all real estate or other property, rights and privileges, whatsoever deemed necessary for the prosecution of its affairs, and which the organization is authorized to acquire, at such price or consideration and generally on such terms and conditions as it thinks fit, and at its discretion pay therefor either wholly or partly in money or otherwise; *specific authorization at a membership meeting shall be required for such expenditures, excepting for routine expenditures not of a substantial nature* ***." (Emphasis added.)

¶ 15        During his testimony, Clair admitted signing an affidavit stating that plaintiff was provided with a copy of the bylaws and acknowledged receipt of them. Clair testified, however, that he

- 4 -

had no specific recollection of providing the bylaws or to whom they were given. Friedman testified that he did not recall seeing Local 726's bylaws before signing the LPA.

¶ 16    The evidence was undisputed that the members of Local 726 did not receive notice of the LPA or vote to authorize the agreement prior to its execution. Becky Strzechowski, the appointed trustee of Local 726 after it went into emergency trusteeship, testified that she had doubts about Clair's authority to sign the LPA because the union's bylaws required two signatures. She stated that she informed Friedman and his attorney of her belief that the LPA was not properly authorized. Strzechowski testified that she reviewed the minutes from Local 726's executive board meetings and membership meetings from the end of 2007 through August 2009. She testified that there was no discussion or authorization of the LPA or related expenditures in any of the minutes she reviewed. According to Strzechowski, the only references to the property were a possible announcement about moving to a new facility and a comment by a member who was unhappy with the new location.

¶ 17    The parties stipulated that none of the minutes from the meetings of the general membership or the executive board for the period of January 2007 through July 2009 reflected a request for authorization from the members to lease or purchase the property or to expend funds for the purpose. The parties also stipulated that none of these minutes showed any Local 726 officer or executive board member disclosing the terms of the LPA to the membership.

¶ 18    At the conclusion of trial, the trial court found that the LPA was valid and enforceable and that defendant was liable to plaintiff for Local 726's breach of the agreement under a theory of successor liability. In a written order, the court held that Clair had apparent authority to execute the LPA on behalf of Local 726 without a vote from the membership or authorization from the executive board. The court also held that the executive board ratified the LPA by signing a "unanimous consent resolution" approving the agreement. "More importantly," the court found, "Local 726 moved into the property and paid rent for seven months without any objection by the Executive Board or the membership, thereby retaining the benefit of the parties' agreement."

¶ 19    Pursuant to the liquidated-damages provision, the court entered judgment for plaintiff on count I in the amount of approximately $2.3 million. The damage award included approximately $300,000 in attorney fees and costs, pursuant to a provision in the LPA that obligated Local 726 to pay all attorney fees and costs incurred by plaintiff in enforcing the terms of the agreement. However, the circuit court rejected plaintiff's argument that it was also entitled to damages pursuant to the double-rent penalty. The court held that this provision "not only requires Local 726 to pay significantly more than the fifth-year purchase price of the property and more than double the plaintiff's loan amount, but also allows the plaintiff to retain ownership of the property." The court reasoned that "[t]his recovery far exceeds any potential actual damages Plaintiff could foreseeably incur, and enforcement of the clause results in an unenforceable windfall for the plaintiff." Citing evidence that plaintiff intended the double-rent provision as a penalty in the event of default, the court concluded that contract provisions that are penal in nature or intended to secure performance of an option through a threat are unenforceable as a matter of public policy.

¶ 20    Defendant filed a posttrial motion to reconsider the trial court's order and vacate the judgment. In the motion, defendant argued for the first time that the LPA was void *ab initio* and unenforceable because it failed to comply with the Act (765 ILCS 115/0.01 *et seq.* (West

2010)). According to defendant, the LPA failed to satisfy the Act's requirements because it was not signed by at least two board members and was never authorized by a vote of the members at a regular meeting after at least 10 days' notice. *Id.* § 2. Defendant also argued that the LPA violated Local 726's own bylaws, which mirrored the requirements in the Act.

¶ 21    The trial court denied defendant's motion. Applying the analysis set forth in *K. Miller*, 238 Ill. 2d 284, the court found that the Act does not explicitly state whether noncompliance with the statutory requirements renders a real estate contract unenforceable. In light of the Act's silence on this issue, the court held that the public policy favoring the enforcement of contracts should prevail. On appeal, the appellate court affirmed in part and reversed in part the trial court's judgment. 2017 IL App (1st) 153300.[2] As to count I, the appellate court agreed with the trial court that the lease was valid and enforceable and that defendant was liable to plaintiff as the successor to Local 726. The appellate court also affirmed the award of damages pursuant to the liquidated-damages provision in the LPA. *Id.* ¶ 90.

¶ 22    This court allowed defendant's petition for leave to appeal under Illinois Supreme Court Rule 315(a) (eff. Nov. 1, 2017).

¶ 23                                            ANALYSIS

¶ 24    On appeal to this court, defendant first argues that the LPA is void *ab initio* and unenforceable because it was not executed in compliance with the Act or Local 726's bylaws. The determination of whether a contract is void *ab initio* is a question of law subject to *de novo* review. *Dowling v. Chicago Options Associates, Inc.*, 226 Ill. 2d 277, 285 (2007); *Alliance Property Management, Ltd. v. Forest Villa of Countryside Condominium Ass'n*, 2015 IL App (1st) 150169, ¶ 26.

¶ 25    Under the common law, voluntary unincorporated associations, such as labor organizations, were not legal entities distinct from their individual members. See *American Federation of Technical Engineers, Local 144 v. La Jeunesse*, 63 Ill. 2d 263, 265-66 (1976); *Butler Manufacturing Co. v. Department of Finance*, 383 Ill. 220, 228 (1943). Accordingly, absent express statutory authorization, unincorporated associations have no right to sue or be sued, acquire or hold title to real property, or enter into contracts in their own names. *Chicago Grain Trimmers Ass'n v. Murphy*, 389 Ill. 102, 107 (1945); 3 Ill. L. and Prac. *Associations* § 5 (Feb. 2019 Update); 6 Am. Jur. 2d *Associations and Clubs* § 11 (Jan. 2019 Update).

¶ 26    In 1949, the Act went into effect, establishing an exception to the common-law rule for unincorporated associations in Illinois. The Act expressly empowers unincorporated associations to lease and own real estate in their names and to sue and be sued on such real estate. 765 ILCS 115/1, 3 (West 2010). In order to execute a valid real estate conveyance, lease, or mortgage, an unincorporated association must follow certain procedures:

> "The presiding officer of such lodge or subordinate body, together with the secretary or officer keeping the records thereof, may execute mortgages and execute or receive conveyances or leases of any real estate by or to such lodge or subordinate body *when authorized by a vote of the members present at a regular meeting held by said lodge or subordinate body, after at least ten days' notice has been given to all members of said*

---

[2]The appellate court reversed the circuit court's judgment in favor of plaintiff on counts II, III, and VIII. These counts are not at issue in the appeal before us.

*lodge or subordinate body* by mailing a written notice of said proposed action to the last known address of all such members.

All conveyances, leases or mortgages executed hereunder shall be in the name of the lodge, attested by the presiding officer and secretary or other officer in charge of the records, and shall have affixed the seal, if any, of such lodge or subordinate body." (Emphasis added.) *Id.* § 2.

¶ 27     Defendant contends that a lease agreement entered into by an unincorporated association that fails to comply with the statutory requirements is void as a matter of law. There is no dispute that Local 726 did not satisfy at least two of the statutory prerequisites for executing a lease and purchase agreement involving real property. First, prior to the execution of the LPA, the members of Local 726 did not receive written notice of the proposed agreement. Second, the members never voted to authorize the LPA at one of their regular meetings. The question is whether Local 726's failure to comply with these statutory requirements renders the LPA void *ab initio* and unenforceable by a court of law. We hold that it does.

¶ 28     Where a party lacks the legal authority to form a contract, the resulting contract is void *ab initio*. *McGovern v. City of Chicago*, 281 Ill. 264, 283 (1917); *Illinois State Bar Ass'n Mutual Insurance Co. v. Coregis Insurance Co.*, 355 Ill. App. 3d 156, 164 (2004). For example, where a municipality exceeds its statutory authority in entering into a contract, the municipality's act is *ultra vires*, and the resulting contract is void *ab initio*. See, *e.g.*, *Grassini v. Du Page Township*, 279 Ill. App. 3d 614, 620 (1996); *Nielsen-Massey Vanillas, Inc. v. City of Waukegan*, 276 Ill. App. 3d 146, 152-53 (1995). "[A] contract that is void *ab initio* is treated as though it never existed; neither party can choose to ratify the contract by simply waiving its right to assert the defect." *Illinois State Bar Ass'n Mutual Insurance Co.*, 355 Ill. App. 3d at 164. Accordingly, a party without authority to enter into a contract may avoid enforcement of the contract as void even if the other contracting party has performed satisfactorily. *Elk Grove Township Rural Fire Protection District v. Village of Mount Prospect*, 228 Ill. App. 3d 228, 234 (1992); *Village of Lisle v. Village of Woodridge*, 192 Ill. App. 3d 568, 576 (1989).

¶ 29     The Act governs an unincorporated association's authority to enter into a lease or purchase agreement for real estate. In the absence of compliance with the statutory prerequisites, an unincorporated association has no power to execute a valid real estate contract. See *American Federation of Technical Engineers, Local 144*, 63 Ill. 2d at 265-66; *Chicago Grain Trimmers Ass'n*, 389 Ill. at 107. Although the Act does not expressly state that the failure to comply with its provisions renders a contract unenforceable, the statute is in derogation of the common law. *American Federation of Technical Engineers, Local 144*, 63 Ill. 2d at 265-66. As such, it must be strictly construed "in order to effect the least—rather than the most—alteration in the common law." *Rush University Medical Center v. Sessions*, 2012 IL 112906, ¶ 16; see also *Williams v. Manchester*, 228 Ill. 2d 404, 419 (2008).

¶ 30     In this case, Local 726 indisputably failed to comply with section 2 of the Act (765 ILCS 115/2 (West 2010)) at the time it executed the LPA. Clair signed the agreement purportedly on behalf of Local 726 despite the fact that the members had not been notified and had not voted to authorize the agreement at a regular meeting. There is no question that Local 726 did not fulfill the clear statutory conditions for executing a lease and purchase agreement of real property. In construing a statute, it is this court's obligation to ascertain and give effect to the intent of the legislature. *Home Star Bank & Financial Services v. Emergency Care & Health*

*Organization, Ltd.*, 2014 IL 115526, ¶ 24. In doing so, we may not depart from the plain statutory language by reading into it exceptions, limitations, or conditions that conflict with the clearly expressed legislative intent. *Id.*

¶ 31    The legislature's intent is evident in the plain language of the Act. Pursuant to the Act, an unincorporated association's members must receive notice of proposed real estate contracts and must have the opportunity to vote in favor of or against entering into such contracts. This language clearly expresses a public policy to protect the individual members of an association from liability arising out of contracts entered into by its leadership.[3] An interpretation of the statute that allows an organization to ignore these requirements would render the express statutory language meaningless. This we may not do. See *Sylvester v. Industrial Comm'n*, 197 Ill. 2d 225, 232 (2001) (the court "must construe the statute so that each word, clause, and sentence, if possible, is given a reasonable meaning and not rendered superfluous [citation], avoiding an interpretation which would render any portion of the statute meaningless or void [citation]"). To hold for plaintiff in this case would suggest that the legislature intended to allow a union to bind its members to a real estate contract for more than $2 million without the members' knowledge or consent. This interpretation is at odds with the clear statutory language. We hold, therefore, that the LPA is void *ab initio* and unenforceable on the grounds that Local 726 lacked the statutory authority to enter into the agreement.[4]

¶ 32    Despite the clear defects in the formation of the LPA, the appellate court below held that the agreement was valid and enforceable based on the analysis set forth in *K. Miller*, 238 Ill. 2d 284. Relying on *K. Miller*, the appellate court examined the statutory language and found no evidence that the legislature intended that noncompliance with the Act render a contract unenforceable. 2017 IL App (1st) 153300, ¶ 18. The court then weighed the competing policy considerations and concluded that the public policy embodied in the Act did not outweigh the public policy of "enforcing otherwise legal private contracts entered into for legitimate purposes." *Id.* ¶ 21. We reject this reasoning because the analysis set forth in *K. Miller* is inapposite.

¶ 33    The issue in *K. Miller* was whether a party's failure to comply with a statute rendered the contract entered into by the parties unenforceable "as a matter of public policy." See *K. Miller*, 238 Ill. 2d at 291. In that case, a contractor entered into an oral agreement for home remodeling work over $1000, in violation of a provision of the Home Repair and Remodeling Act (815 ILCS 513/15 (West 2006)) that required such contracts to be in writing. *K. Miller*, 238 Ill. 2d at 286-87. To determine whether the statutory violation rendered the oral contract unenforceable, this court looked to section 178 of the Restatement (Second) of Contracts (1981), which stated, in part:

> " '§ 178 When a Term Is Unenforceable on Grounds of Public Policy
>
>      (1) A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement

---

[3]It is important to note that the Act protects not only members of labor unions but members of "[a]ny unincorporated lodge or subordinate body of any society or order which is duly chartered by its grand lodge or body" (765 ILCS 115/1, 2 (West 2010)), including, *e.g.*, social or fraternal organizations, lodges, societies, or clubs.

[4]In light of the clear violations of the statute's membership-related requirements, we need not reach the issue of whether two signatures were necessary to render the agreement enforceable.

is clearly outweighed in the circumstances by a public policy against the enforcement of such terms.' " *K. Miller*, 238 Ill. 2d at 293 (quoting Restatement (Second) of Contracts § 178 (1981)). After applying the Restatement's analysis, we concluded that there was "no public policy requiring that oral contracts for home remodeling over $1,000 be held unenforceable." *Id.* at 301.

¶ 34    In contrast to *K. Miller*, the contract in this case is void and unenforceable because one of the contracting parties lacked the legal authority or capacity to enter into the contract. As we have explained, at common law, an unincorporated association was legally incapable of owning or leasing property. The Act changed the common-law rule by setting forth specific conditions that, if satisfied, permit an unincorporated association to own or lease real property in Illinois. Thus, the Act was the sole source of Local 726's power to enter into the agreement with plaintiff. Because Local 726 failed to fulfill the statutory prerequisites for executing a lease and purchase agreement, the LPA was void *ab initio*. See *McGovern*, 281 Ill. at 283 (a contract entered into without authority is *ultra vires* and void); *Grassini*, 279 Ill. App. 3d at 620 (where a contracting party exceeds its statutory authority in entering into a contract, the contract is void *ab initio*).

¶ 35    Plaintiff concedes that Local 726 failed to satisfy the Act but argues nonetheless that equitable considerations compel enforcement of the parties' agreement. Specifically, plaintiff argues that (1) defendant judicially admitted the validity of the LPA, (2) Local 726 and defendant ratified the LPA through their course of conduct and, thus, are estopped from arguing the LPA is unenforceable, (3) the rule in *Schnackenberg v. Towle*, 4 Ill. 2d 561 (1954), compels this court to uphold the enforceability of the LPA, and (4) Clair had apparent authority to execute the LPA. We reject each of these arguments as untenable based on our holding that the contract was void at its inception as a matter of law.

¶ 36    Plaintiff first contends that defendant judicially admitted the validity of the LPA in its verified answer and affirmative defenses. Specifically, one of the affirmative defenses alleged that, on or about September 30, 2009, defendant advised plaintiff that it could not afford to comply with the LPA's provisions. It further alleged that the parties entered into negotiations to modify the LPA and that the negotiations "resulted in a meeting of the minds relating to a modification of the Lease." According to plaintiff, these allegations constitute a judicial admission by defendant that the LPA was valid at the outset, since only a valid lease is capable of being modified. Plaintiff's argument is unavailing.

¶ 37    Judicial admissions are defined as "deliberate, clear, unequivocal statements by a party about a concrete fact within that party's knowledge." *In re Estate of Rennick*, 181 Ill. 2d 395, 406 (1998) (citing *Hansen v. Ruby Construction Co.*, 155 Ill. App. 3d 475, 480 (1987)). Judicial admissions are conclusively binding on a party and, thus, may not be contradicted in a motion for summary judgment or at trial. *Id.* at 406-07. It is well established that legal issues cannot be judicially admitted and, instead, are questions for the court to decide. *Id.* at 406; see also *Knauerhaze v. Nelson*, 361 Ill. App. 3d 538, 557-58 (2005) ("judicial admissions 'are formal concessions in the pleadings in the case or stipulations by a party or its counsel that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact' " (citing 2 John W. Strong, McCormick on Evidence § 254, at 142 (4th ed. 1992))).

¶ 38    The question of a contract's validity is a matter of law for the court to decide. See *Alliance Property Management, Ltd.*, 2015 IL App (1st) 150169 ¶ 26 (the interpretation of a contract to determine whether it is void *ab initio* is a question of law). Even if the allegations in defendant's affirmative defenses could be construed as an admission that the LPA was a valid contract, this would not constitute a judicial admission because it is a legal conclusion. See *In re Marriage of Osborn*, 206 Ill. App. 3d 588, 594 (1990). Consequently, plaintiff's argument that defendant judicially admitted the validity of the LPA is without merit.

¶ 39    Plaintiff next argues that both Local 726 and defendant effectively ratified the LPA and waived the protections of the Act through their course of conduct. In other words, plaintiff contends that defendant is estopped from asserting that the LPA is unenforceable. In support of this contention, plaintiff directs our attention to the following facts. Prior to the execution of the LPA, Clair had unilaterally signed leases on the union's behalf without complying with the Act. None of Local 726's members objected to the LPA either before or after the union took possession of the premises. Moreover, members of Local 726's executive board signed a consent resolution approving the LPA after its execution. Local 726 subsequently paid rent on the property for seven months pursuant to the LPA. After Local 726 was placed into trusteeship, both it and Local 700 proceeded as though the LPA was a valid agreement, even while objecting to its terms. Finally, neither Local 726 nor Local 700 asserted that the LPA was invalid pursuant to the Act until after the trial had concluded and a judgment was entered in favor of plaintiff.

¶ 40    Plaintiff's argument fails to recognize that equitable doctrines such as ratification and equitable estoppel do not apply to a contract that is void *ab initio*. See *Alliance Property Management, Ltd.*, 2015 IL App (1st) 150169, ¶ 29 (" '[r]atification is impossible if there is no power to contract' " (quoting *Granzow v. Village of Lyons*, 89 F.2d 83, 85 (7th Cir. 1937))); *State Bar Ass'n Mutual Insurance Co.*, 355 Ill. App. 3d at 164 ("a contract that is void *ab initio* is treated as though it never existed; neither party can choose to ratify the contract by simply waiving its right to assert the defect"); *Nielsen-Massey Vanillas, Inc.*, 276 Ill. App. 3d at 152-53 (holding that a contract entered into by a party in the absence of authority is void *ab initio* and cannot be enforced by estoppel). Accordingly, this argument also fails.

¶ 41    Plaintiff next argues that the rule in *Schnackenberg*, 4 Ill. 2d 561, is controlling. This rule states, "where a contract is illegal or against public policy a court of equity will not, at the instance of one of the parties who participates in the illegal or immoral intent, either compel the execution of the agreement or set it aside after it has been executed, because to give relief in such a case would injure and counteract public morals." *Id.* at 565. The rule applies to "those situations where to allow recovery would permit a party to benefit from conduct in contravention of public policy." *Laleman v. Crombez*, 6 Ill. 2d 194, 198-99 (1955). Only illegal contracts or those against public policy are subject to the rule. See *Vine Street Clinic v. HealthLink, Inc.*, 222 Ill. 2d 276, 299 (2006); *Aydt v. De Anza Santa Cruz Mobile Estates*, 763 F. Supp. 970, 974 (N.D. Ill. 1991) (holding that the *Schnackenberg* rule applies to contracts whose subject matter is illegal, *e.g.*, transactions in violation of usury statutes, blue sky laws, rent control ordinances, and anti-gambling statutes). Plaintiff cites no case, and we have found none, to support its claim that *Schnackenberg* applies to a contract entered into by a party who lacks the legal authority to form the contract.

- 10 -

¶ 42    Plaintiff's final argument for the enforceability of the LPA is that Clair had apparent authority to execute the agreement, thus binding Local 726 to the agreement. The doctrine of apparent authority stems from an agency relationship. *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 523-24 (1993). Under this doctrine, "where a principal has created the appearance of authority in an agent, and another party has reasonably and detrimentally relied upon the agent's authority, the principal cannot deny it." *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 35 (citing *Petrovich v. Share Health Plan of Illinois, Inc.*, 188 Ill. 2d 17, 31 (1999)). Like the doctrine of equitable estoppel, apparent authority is rooted in equitable principles. *Id.* ¶¶ 34-35.

¶ 43    The apparent authority doctrine is not relevant here. A contract that is void *ab initio* is treated as though it never existed and, thus, cannot be enforced by either party. *Illinois State Bar Ass'n Mutual Insurance Co.*, 355 Ill. App. 3d at 164 ("stating where 'a contract is void *ab initio*, or where it becomes void by the terms and conditions therein expressed and agreed to by the parties, no action can be maintained thereon by either party' " (quoting *Smith v. Hunter*, 171 Ill. App. 30, 36 (1912))). The contract is unenforceable because the statutory requirements for an unincorporated association to enter into the contract were not fulfilled. If the principal has no authority to enter into a contract, it stands to reason that an agent of the principal has no authority to bind the principal to the contract. Thus, even if Local 726 held out Clair as having apparent authority to sign real estate contracts on its behalf, this would not render the contract legally enforceable.

¶ 44                                              CONCLUSION

¶ 45    Because we hold that the LPA is void *ab initio* and unenforceable, it is not necessary to address defendant's alternative arguments that the trial court erroneously imposed successor liability and enforced the liquidated-damages provision. We therefore reverse the part of the judgments of the circuit and appellate courts pertaining to count I of the amended complaint. The cause is remanded to the circuit court with directions to vacate the judgment for plaintiff and enter judgment for defendant on count I.

¶ 46    Judgments reversed.

¶ 47    Cause remanded with directions.