2026 IL App (1st) 251140

FIFTH DIVISION
June 26, 2026

No. 1-25-1140

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| JEFFREY WAGNER, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 2022 CH 08189 |
| CERTAIN UNDERWRITERS AT LLOYD'S | ) | |
| LONDON, | ) | Honorable |
| | ) | Neil H. Cohen, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE MIKVA delivered the judgment of the court.
Justices Oden Johnson and Wilson concurred in the judgment.

**ORDER**

¶ 1   *Held*: Circuit court's judgment in favor of the insured regarding the amount of a lump sum payment due under a disability policy is affirmed in part and reversed in part. The insured was entitled to an increased payment, but not in the amount awarded.

¶ 2   The named insured in this insurance coverage dispute sought an increased lump sum disability benefit based on his increased earnings after issuance of the policy but before the onset of his disability. Following a bench trial on the documentary evidence, the trial court entered judgment in favor of the insured, awarding him the requested increase plus pre- and post-judgment interest. The insurer now appeals, arguing (1) the insured failed to prove that conditions in the

endorsement entitling him to the increase were satisfied; (2) the awarded amount, based on the court's conclusion that ambiguities should be construed against insurer as the endorsement's drafter, was far too high; and (3) the insured was either not entitled to prejudgment interest or was entitled to it at a lower rate. For the reasons given below, we affirm in part and reverse in part.

¶ 3                                    I. BACKGROUND

¶ 4                        A. The Disability Policy and Endorsement

¶ 5    The plaintiff in this matter, Jeffrey Wagner, was the named insured and loss payee of a disability insurance policy (certificate No. 1582372-7), issued to his employer, the Chicago law firm Kaye Scholer, LLP (n/k/a Arnold & Porter, Kaye Scholer, LLP), by the defendant, Certain Underwriters at Lloyd's, London (Underwriters), through its coverholder, Petersen International Underwriters (PIU). The policy, covering the period from June 1, 2015, through May 31, 2020, provided that, if Mr. Wagner suffered a total disability as a result of sickness or injury, he would be entitled to monthly disability benefits equal to 65% of his earned income, or $32,100 ("Monthly Benefit Amount"), paid over the lesser of a period of 60 months or until Mr. Wagner reached the age of 70. It also provided, following a period of 66 months and a finding of permanent total disability, that he would receive a lump sum payment ("Principal Sum Amount") of $5,000,800.

¶ 6    Attached as an optional rider to the policy was an "Automatic Benefit Increase Endorsement" that provided as follows:

"If you are not currently on claim and you can document that you have had an increase in your Earned Income, once received and agreed to by Underwriters, the Monthly Benefit Amount may be increased up to the Maximum Benefit Participation Limit, not to exceed the Maximum Monthly Benefit Guaranteed Issue Limit.

If applicable, the Principal Sum Amount may be increased, not to exceed the

Maximum Principal Sum Benefit Participation Limit, not to exceed the Maximum Principal Sum Benefit Guaranteed Issue Limit.

Any increase for the Monthly Benefit Amount or the Principal Sum Amount, premium increases will be on a monthly pro-rata basis effective from the first of the month, in the month for which Underwriters agreed to the increase.

Maximum Monthly Benefit Participation Limit hereby stated as 65%.

Maximum Monthly Benefit Guaranteed Issue Limit hereby stated as $250,000.00 per month.

Maximum Principal Sum Benefit Participation Limit hereby stated as 5 times annual income.

Maximum Principal Sum Benefit Guaranteed Issue Limit Hereby stated as $10,000,000.00."

¶ 7    "Earned Income" was defined in the policy as "(1) Salary and fees (gross income less business expenses, but before income taxes); (2) Commissions and bonuses; and (3) Non-passive income reported on [the employee's] personal tax return."

¶ 8                                    B. Mr. Wagner's Allegations

¶ 9    Mr. Wagner filed this declaratory judgment action against Underwriters on August 19, 2022. He alleged that on November 7, 2016, while the disability policy was in effect, he became permanently and totally disabled. He submitted a claim to Underwriters, it was approved, and he began to receive monthly disability benefits. Mr. Wagner alleged that although increases in his earnings had been reported to Underwriters by Kaye Scholer before the onset of his disability, the "Principal Sum Amount for the Lump Sum Payment was not adjusted" as called for in the Automatic Benefit Increase Endorsement.

¶ 10    Mr. Wagner further alleged that at no time did Underwriters contact him to inform him that the increase was not in fact automatic but required a separate application by him and approval by Underwriters. At the conclusion of the applicable elimination period, Underwriters paid Mr. Wagner the Principal Sum Amount of $5,000,800, but "refused to pay any additional amount commensurate with his increased earnings following the issuance of the [policy] and prior to the onset of his Permanent Total Disability." Mr. Wagner asked the circuit court to find he was entitled to "an additional payment from [Underwriters] equal to five times his earnings at the time he became Permanently Totally Disabled, less the indemnity already paid," and to assess penalties and attorney fees against Underwriters under section 155 of the Illinois Insurance Code (215 ILCS 5/155 (West 2022)), for refusing in bad faith to pay him what he was due under the policy.

¶ 11    Underwriters answered, asserting the affirmative defense of payment, and Mr. Wagner later dismissed his claim for penalties and attorney fees under section 155 of the Insurance Code.

¶ 12                              C. Summary Judgment

¶ 13    The parties filed cross motions for summary judgment. Mr. Wagner argued that on June 16, 2016—before he became disabled or submitted a claim—Underwriters received a census report from Kaye Scholer showing that his annual income had increased from $1,330,276 to $1,350,000. Per the endorsement, Underwriters was obligated to automatically increase the Principal Sum Amount but had refused to pay him anything more than the initial lump sum of $5,000,800. Mr. Wagner contended that because the only formula in the endorsement for calculating the increased amount was the specification that it could not exceed five times his annual income, or $6,750,000, that was the amount the company was obligated to pay him. Underwriters thus owed him an unpaid balance of $1,749,200, and prejudgment interest at 9% per annum under section 357.9 or 357.9a of the Illinois Insurance Code (Code) (215 ILCS 5/357.9, 357.9a (West 2024)).

¶ 14    Underwriters argued in response that Mr. Wagner did not qualify for an increased Principal Sum Amount because there was "no number [it] had ever acknowledged, or otherwise agreed to" as Mr. Wagner's annual earnings that was greater than the $1,330,276, it had used to calculate the initial Principal Sum Amount of $5,000,080. If Mr. Wagner had qualified for an increase in benefits, Underwriters maintained, he would have been "advised in writing of the amount of the new benefit and of the corresponding premium increase" before he became disabled. Underwriters also argued that even if Mr. Wagner was entitled to an increase, he was not entitled to a Principal Sum Amount of five times his annual income, an amount intended as a cap on what he could possibly be entitled to as a Principal Sum Amount.

¶ 15    The trial court largely denied the motions. It concluded that there were questions of fact concerning whether Mr. Wagner's income had increased in 2016, whether Underwriters had received and agreed to documentation of such an increase, and what amount, if any, Mr. Wagner might be due under the endorsement. The court granted Underwriters partial summary judgment on the limited question of whether Mr. Wagner was automatically entitled, as he maintained, to a Principal Sum Amount equal to five times his salary, stating:

> "The endorsement is not ambiguous on the issue of whether the endorsement automatically entitles Plaintiff to an increase in the Principal Sum Amount benefit of five times his annual salary. It does not. Rather, the endorsement provides for an increase "'up to" five times his annual salary upon documentation of such an income increase to Underwriters and Underwriters' agreement. The endorsement's silence as to how the increase in the Principal Sum Amount benefit is calculated does not render the endorsement ambiguous or entitle Plaintiff to an automatic increase to the maximum amount allowed under the endorsement."

¶ 16                    D. The Evidence and Arguments at Trial

¶ 17    A bench trial was held on the documentary evidence, and the parties submitted proposed findings of fact and conclusions of law. Although that evidence constitutes hundreds of pages of exhibits in the record on appeal, much of what is at issue is either undisputed or supported only by a few key documents.

¶ 18    Kaye Scholer purchased the long-term disability policy at issue here in May 2015. It was issued with an effective date of June 1, 2015. According to Mr. Wagner, the only information he received from Underwriters at that time was the policy and endorsements themselves, which Underwriters drafted. The terms of the policy were not negotiated, and Mr. Wagner was provided with no explanation for how the amounts set out in the schedule of benefits had been calculated, including the Principal Sum Amount.

¶ 19    Mr. Wagner suffered his heart attack on November 7, 2016, gave oral notice of his claim to Underwriters on March 9, 2017, and filed his written claim under the disability policy in May or June 2017. His claim was approved on March 16, 2018.

¶ 20    Mr. Wagner understood that his Monthly Benefit Amount would equal 65% of his pre-loss earned income, less any payments he received from other long-term disability coverage held by him, and Underwriters did in fact pay him that amount. He raised the issue of an increase to the Principal Sum Amount set out in the schedule of benefits in communications he had with PIU/Underwriters—through Kaye Scholer's insurance broker, Ann Brennan, and, in some cases, through Meenu Hastings, an employee of Underwriters' third-party claims administrator Disability Management Services, Inc. (DMS)—during the first half of 2018. Mr. Wagner consistently reiterated his belief that any increase in his income would automatically entitle him to a Principal Sum Amount of five times his salary, and Underwriters consistently disagreed with that reading

of the endorsement. Mr. Wagner also expressed his understanding that any increase would be automatic, per the language of the endorsement, and, according to what Ms. Brennan had told him, based on annual census data provided by Kaye Scholer to Underwriters. Underwriters, on the other hand, maintained that Mr. Wagner needed to request an increased payment and submit documentation of his increased income prior to his claim.

¶ 21   A series of emails in February 2018 specifically concerned whether Mr. Wagner's income had increased in 2016 and, if so, whether and how documentation of that increase was communicated to PIU/Underwriters. In a February 21, 2018, email to PIU listing the figures she had for Mr. Wagner's income, from 2013 to 2016, Ms. Brennan stated, "I have the census data from 2016 sent to [PIU] on 6/16/2016 showing [Mr. Wagner's] compensation as $1,350,000" and "[h]is comp in 2016 was $1,350,000 from census." On February 22, 2018, PIU confirmed that the 2015 income it had used to calculate the amounts in the policy's schedule of benefits, including the Principal Sum Amount of $5,000,080, was $1,330,276. At her deposition, Ms. Brennan reviewed this exchange and confirmed that in it she had reported, based on census data from Kaye Scholer, an increase in Mr. Wagner's compensation in 2016 from $1,330,276 to $1,350,000.

¶ 22   On March 6, 2018, DMS informed Mr. Wagner how the Principal Sum Amount in the schedule of benefits had been calculated by PIU, noting that it was "intended to simulate benefits to age 70." That calculation was as follows:

> "Age at inception = 52
> Age 70-52 = 18 years;
> 18 yrs * 12 mos/yr = 216 months
> 216 mos – 60 mos benefit period = 156 mos
> 156 mos * $32,056 = $5,000,736.00 (rounded up to $5,000,800; does not exceed 5 times your annual income)"

¶ 23   In responding to Mr. Wagner's requests for production, Underwriters' counsel stated that PIU had two spreadsheets purporting to show 2016 census data for Kaye Scholer partners. "Given

7

the age of the spreadsheets," counsel noted, "I'm not even certain why PIU still had them but I have two that appear to have been submitted in 2016. I cannot access either one of them and if we are able to obtain the passwords, I will have a look and provide you anything I can. We can talk further about this soon."

¶ 24    Underwriters' later produced three redacted pages from a 2016 census providing a 2016 base income of $1,300,000 for Mr. Wagner. In the accompanying email, counsel stated, "I still do not have the answer to my questions about Mr. Wagner's income numbers reflected on the attached document as we know PIU calculated his benefits based on $1,330,076. I suspect the answer will be something along the lines of 'it's contained on another Census we don't have access to.' "

¶ 25    At argument, the trial court noted that the only evidence it had of Mr. Wagner's total income in 2016, as opposed to his base income, was the email and deposition testimony of Ms. Brennan, in which she stated that Mr. Wagner's total income was $1,350,000, an increase from $1,330,276 in 2015. According to Ms. Brennan's email and deposition testimony, she gave that information to PIU on June 16, 2016.

¶ 26                    E. Judgment in Favor of Mr. Wagner

¶ 27    On January 27, 2025, the trial court entered an order accepting and incorporating Mr. Wagner's proposed findings of fact and conclusions of law in their entirety. The court concluded that Mr. Wagner was eligible for an increased Principal Sum Amount under the endorsement. Specifically, the court concluded that (1) the endorsement's requirements were unambiguous and would be given their plain and ordinary meaning; (2) Mr. Wagner did not go "on claim" until March 16, 2018, when Underwriters approved his claim for benefits; (2) Kaye Scholer had transmitted census reports documenting Mr. Wagner's 2016 earned income to Underwriters nearly two years before that, in 2016; (3) Underwriters had admitted, in its 2018 communications with

8

Mr. Wagner and in its court filings, that Mr. Wagner's 2016 income increase qualified him for an increase under the endorsement; and (4) Underwriters' other arguments, including that it had not "approved" the increase by sending him an eligibility letter and increasing his premiums, lacked merit. Mr. Wagner was therefore entitled to an automatic benefit increase under the endorsement.

¶ 28     As to the amount of that increased benefit, the court concluded that (1) Underwriters had chosen not to include any formula for calculating the increase in the endorsement; (2) there was no evidence of a mutual understanding or intent for how the increase should be calculated; and (3) the parties had submitted over a dozen possible calculations, resulting in increases of between $166,000 and $1,749,000. Because policy language susceptible to more than one reasonable interpretation is ambiguous and must be strictly construed in favor of the insured, the court concluded that it must choose the calculation that was most favorable to Mr. Wagner. The court therefore found that Mr. Wagner was entitled to an increased Principal Sum Amount of five times his annual income, less the amount he had already been paid, or $1,749,200.

¶ 29     Finally, the trial court agreed that Mr. Wagner was also entitled to prejudgment interest, at a rate of 9% per annum, under sections 357.9 and 357.9a of the Code (215 ILCS 5/357.9, 357.9a (West 2024)). Mr. Wagner was instructed to prepare a final order for the court's review.

¶ 30     Underwriters objected to that proposed order and argued, for the first time, that the disability policy was a surplus line policy specifically exempted from those interest provisions by section 455 of the Code (215 ILCS 5/455 (West 2024)). Following briefing, the court issued a separate memorandum and order on May 12, 2025. It concluded both that Underwriters had forfeited the surplus line exemption by failing to raise it sooner and that the argument also lacked merit because the policy was not surplus line insurance but "accident and health insurance" subject to sections 357.9 and 357.9a of the Insurance Code.

¶ 31    In its final order and judgment, entered on May 15, 2025, the trial court awarded Mr. Wagner $2,224,679.69 ($1,749,200 plus $474,871.86 in prejudgment interest and $607.83 in costs) and post-judgment interest at a rate of 9% per annum.

¶ 32    Underwriters now appeals.

¶ 33                                    II. JURISDICTION

¶ 34    The trial court entered judgment in favor of Mr. Wagner on May 15, 2025, and Underwriters filed a timely notice of appeal from that order on June 13, 2025. We have jurisdiction over this appeal pursuant to Illinois Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303 (eff. July 1, 2017), governing appeals from final judgments entered by the circuit court in civil cases.

¶ 35                                    III. ANALYSIS

¶ 36                            A. Sufficiency of the Evidence

¶ 37    Underwriters first argues that the evidence at trial did not show Mr. Wagner was entitled to any increased Principal Sum Amount under the terms of the Automatic Benefit Increase Endorsement. As in all coverage disputes, the burden is on the insured to prove that a claim falls within the coverage provided by the insurance policy and any applicable endorsements. *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446, 453 (2009). The endorsement here provided: "If you are not currently on claim and you can document that you have had an increase in your Earned Income, once received and agreed to by Underwriters, the Monthly Benefit Amount may be increased up to [specified limits]" and, "[i]f applicable, the Principal Sum Benefit Amount may be increased, not to exceed [specified limits]." Underwriters argues Mr. Wagner failed to prove by a preponderance of the evidence that (1) he was not already "on claim" when (2) there was a documented increase in his 2016 earned income that (3) Underwriters received or agreed to.

10

¶ 38    To the extent that our review of these assertions requires us to construe the policy and endorsement, our review is *de novo*. See *Continental Casualty Co. v. Law Offices of Melvin James Kaplan*, 345 Ill. App. 3d 34, 37 (2003) ("construction of an insurance policy and a determination of the rights and obligations thereunder are questions of law for the court" (internal quotation marks omitted)). And although we usually defer to the trial court's factual findings, reversing only where they are against the manifest weight of the evidence, we agree with the parties that where, as here, the court did not hear live testimony, our review of the sufficiency of the evidence is also *de novo*. *Addison*, 232 Ill. 2d at 453 (noting that in such circumstances, "the trial court [i]s in no superior position than any reviewing court to make findings").

¶ 39    Mr. Wagner urges us to review two of the trial court's determinations, made implicitly when it adopted his proposed findings of fact and conclusions of law, under the more deferential abuse-of-discretion standard. He asked the court to treat a statement made by Underwriters in its reply in support of its motion to dismiss and later in its answer as a judicial admission that his income increased by some unspecified amount in 2016. He also asked the court to impose an adverse evidentiary inference regarding the contents of a Kaye Scholer 2016 census report Underwriters identified but did not produce during discovery. As Underwriters points out, however, these requests were not made in a discovery or evidentiary motion, but rather as part of the trial court's overall consideration of the documentary evidence and whether, based on that evidence, Mr. Wagner had met his burden of demonstrating coverage under the endorsement.

¶ 40    We agree with Underwriters that *Braverman v. Kucharik Bicycle Clothing Co.*, 287 Ill. App. 3d 150, 157 (1997), is instructive. The court in that case made no finding of bad faith but simply considered whether, given the conspicuous absence of the best evidence of a potential defect, the product itself, the available circumstantial evidence might still be sufficient to meet the

plaintiff's burden of proof. *Id.* Because the court did not impose a sanction or bar evidence pursuant to Illinois Supreme Court Rule 219(c), the applicable standard of review was "not whether the trial court abused its discretion." Instead, the court applied the *de novo* standard applicable to any other consideration of a motion for summary judgment. *Id.* We agree with Underwriters that the same reasoning applies here and will accordingly review these matters *de novo* as well.

¶ 41                                    1. Whether Mr. Wagner was "On Claim"

¶ 42    The first requirement for payment of an increased Principal Sum Amount under the endorsement was that Mr. Wagner not be "currently on claim." Mr. Wagner argues that he did not go on claim until March 16, 2018, when Underwriters formally approved his disability claim and confirmed he was entitled to benefits under the policy. Underwriters argues that because his claim was approved "as of" November 7, 2016, when he suffered his heart attack and became disabled, that is when he went on claim. Neither Mr. Wagner nor Underwriters has provided a definition of what it means to be "on claim." Nor is any such definition found in the policy or endorsement, or in any of the documentary evidence submitted to the trial court. However, we need not decide precisely when Mr. Wagner went on claim. For the reasons stated below, we conclude that the evidence was sufficient to support the trial court's finding that Underwriters received and approved documentation of Mr. Wagner's 2016 earned income increase in June 2016, well before any date on which he could arguably have gone on claim.

¶ 43                                    2. Documentation of Mr. Wagner's Increased Income

¶ 44    Underwriters argues that Mr. Wagner failed to prove the second condition, a documented increase in his earned income prior to going on claim. As an initial matter, we agree with Underwriters that neither judicial admissions nor an adverse inference can help Mr. Wagner meet his burden of proof on this point. "Judicial admissions are formal admissions in the pleadings that

have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *Serrano v. Rotman*, 406 Ill. App. 3d 900, 907 (2011). To qualify as such, they must be "deliberate, clear, unequivocal statements by a party about a concrete fact within that party's knowledge." (Internal quotation marks omitted.) *1550 MP Road LLC v. Teamsters Local Union No. 700*, 2019 IL 123046, ¶ 37. Underwriters' statement, in its answer to the complaint and in its motion to dismiss briefing, that "here, PIU knew of the increase" is not such a statement, as it may simply have referred to the difference between Mr. Wagner's 2014 income and the $1,330,276, used to calculate the initial Principal Sum Benefit of $5,000,800. Where Underwriters has consistently denied that Mr. Wagner's earned income ever exceeded $1,330,276, we are unpersuaded that we should read ambiguous statements in the pleadings to mean the contrary.

¶ 45    Nor are we persuaded that an adverse inference was appropriate here, based on the census report that PIU located but that Underwriters did not produce during discovery. Underwriters' excuse for not producing the document was that it did not have the password to access its contents. As Underwriters points out, Mr. Wagner did not attempt to obtain an accessible version of the file from Kaye Scholer, its apparent author. Nor did he move to compel Underwriters to produce the inaccessible file or seek an adverse inference as a discovery sanction for its failure to do so. As the case Mr. Wagner himself relies on makes clear, an adverse inference is only appropriate where, among other things, the evidence sought is not equally available to the adverse party and no reasonable excuse for the failure to produce it has been shown. *Jenkins v. Dominick's Finer Foods*, 288 Ill. App. 3d 827, 831 (1997). We are unconvinced that either proposition is true here.

¶ 46    Turning to the evidence that was actually presented, Underwriters emphasizes that Mr. Wagner's sole proof that his earned income increased in 2016 consisted of statements made by Kaye Scholer's insurance broker, Ann Brennan, in a February 2018 email exchange with PIU, in

which she represented that his earned income had increased from $1,330,276, in 2015, to $1,350,000, in 2016. Although Ms. Brennan purported to make that statement based on census data that was in her possession, that census data itself does not appear in the record. It is true that there was no independent evidence offered to corroborate the data Ms. Brennan said was contained in that census, but if she had misrepresented that data, PIU would surely have corrected her, and it did not. It responded to her email by saying that Mr. Wagner's "2016 Annual Base" was $1,300,000." Nothing about that response contradicted Ms. Brennan's statement that his earned income or projected earned income had increased to $1,350,000. As the policy definitions make clear, "earned income" includes not only base income but also bonuses and other incentives. Here, Ms. Brennan's email, the contents of which were reaffirmed by her at her deposition and by Mr. Wagner at his, supports Mr. Wagner's claim that in June 2016 his projected earned income was $1,350,000, including a base of $1,300,000, and bonuses or other incentives totaling $50,000, for an increase of $19,774 over his 2015 income.

¶ 47     When asked at oral argument in this court what evidence it had to counter Ms. Brennan's assertions, Underwriters said she "may have been transposing columns when she was looking at the census." It agreed that base earned income was typically less than final earned income, but suggested, based on the one census document appearing in the record, that Ms. Brennan  may have been looking at Mr. Wagner's final earned income for 2014, which in fact was $1,350,000. There is no reason, though, that his projected earned income in 2016 may not have been the same as his final earned income in 2014. Underwriters' insistence that Ms. Brennan "got her numbers wrong" is, in the end, only speculation. The trial court did not find it compelling, and neither do we.

¶ 48     The burden in a civil case is proof by a preponderance of the evidence, and a party proves a proposition under that standard by convincing the trier of fact that it is "more likely true than not

14

true." *In re Marriage of Osseck*, 2021 IL App (2d) 200268, ¶ 54. Here, Mr. Wagner presented credible evidence that his earned income increased in 2016, and Underwriters put forward nothing to the contrary. The trial court did not err by concluding that Mr. Wagner satisfied his burden of proving a documented increase in his earned income prior to going on claim.

¶ 49                    3. Receipt and Agreement by Underwriters

¶ 50     As to the last requirement, receipt of and agreement to the increase by Underwriters, the plain language of the endorsement does not specify what exactly is meant by or required to show this. Although it does suggest that premiums may increase, it certainly does not state that an insured must separately apply for an increased Principal Sum Amount, receive a formal approval letter, or be charged increased premiums before being entitled to an increased Principal Sum Amount. Indeed, the endorsement states that any increase will be "automatic." The undisputed evidence at trial was that PIU/Underwriters received and agreed to use Kaye Scholer's annual censes data, including the projected earned income figures it established each spring, to determine which partners were eligible for such increases. PIU's response to Ms. Brennan's February 21, 2018, email did not constitute, for the reasons stated above, an express rejection of the claimed increase, as Underwriters now argues. And, although the fact that Underwriters did not raise Mr. Wagner's premiums could be considered, as the company suggests, evidence that it did not receive and agree to a documented increase in his income, it could also indicate that Underwriters, having received documentation of that increase in a form it had agreed to rely on, failed, for whatever reason, to internally adjust its premium calculations.

¶ 51     The trial court did not err in concluding that a preponderance of the evidence presented at trial demonstrated that the conditions for an increased Principal Sum Amount set out in the Automatic Benefit Increase Endorsement were met here because prior to Mr. Wagner going on

claim, Underwriters received and agreed to documentation showing that his income had increased from $1,330,276 to $1,350,000.

¶ 52                                    B. Calculation of the Increase

¶ 53    This brings us to calculation of the increased Principal Sum Amount. The trial court found that Underwriters, as the drafting party, could have included in the endorsement a formula for calculating the amount of an increase to the Principal Sum Amount when the conditions for such an increase were met but did not do so, and that the endorsement must therefore be strictly construed against it to give Mr. Wagner the best possible outcome. According to the trial court, that was an amount equal to five times Mr. Wagner's income, less the amount he had already been paid, or $1,749,200, plus prejudgment interest. Underwriters argues this unfairly resulted in a sizeable windfall in Mr. Wagner's favor.

¶ 54    As our supreme court has made clear, in construing insurance contracts, we apply the same rules applicable to all contract interpretation. *Acuity v. M/I Homes of Chicago, LLC*, 2023 IL 129087, ¶ 30. Our "primary objective" is to determine the intent of the parties, as expressed in the policy language. *Id.* If that language "is susceptible to more than one reasonable interpretation, it is considered ambiguous and will be construed strictly against the insurer." *Id.* ¶ 31.

¶ 55    It is this last rule that the trial court applied and that Mr. Wagner asks us to apply here. The problem is that Mr. Wagner is unable to point to any ambiguity in the policy language. The endorsement says simply: "the Principal Sum Amount may be increased," without explaining how that increase is to be calculated. This is not an ambiguity, so much as a missing term.

¶ 56    Section 204 of the Restatement (Second) of Contracts lays out the proper approach where the parties' contract fails to provide for a necessary calculation. The Restatement provides that "[w]hen the parties to a bargain sufficiently defined to be a contract have not agreed with respect

to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." Restatement (Second) of Contracts, sec. 204. In such cases, the court is directed to supply a term "which it determines to be reasonable either by logical deduction from the agreed terms or on the basis of what comports with standards of fairness." *Dato v. Mascarello*, 197 Ill. App. 3d 847, 851 (1989). Thus, we agree with Underwriters that fairness must be considered in making the necessary calculation even where, as in this case, Underwriters as the drafter of the endorsement failed to provide a methodology.

¶ 57    Moreover, even if we view this as an ambiguity, rather than a missing term, a court may only choose between competing and "*reasonable"* interpretations of a contract when construing an ambiguity against the drafting party. (Emphasis added.) *Acuity*, 2023 IL 129087, ¶ 31. The problem with each of the calculations that Mr. Wagner has suggested and that were accepted by the trial court is that *none* of them are a reasonable interpretation of what the endorsement contemplated for recalculation of the Principal Sum Amount due, in the event Mr. Wagner had an increase in earnings.

¶ 58    The parties agree that the Principal Sum Amount was intended to compensate Mr. Wagner from the time he was no longer receiving monthly benefits until he reached 70, here an additional 156 months. They also agree that the benefit was calculated at 65% of his salary. That formula can easily be used to calculate the increased amount due over 156 months as a result of Mr. Wagner's additional $19,724 in annual earnings. One simply multiplies that amount by 65% ($12,820.60) divides it by 12 months ($1,068) and multiplies the result by 156 months, for a total of $166,608.

¶ 59    Mr. Wagner insists that it is inappropriate to apply this formula without going back and correcting the way that Underwriters used it to calculate the initial Principal Sum Amount of $5,000,800. He argues that there are two significant errors Underwriters made when it performed

that calculation. First, as the trial court found, Underwriters gave itself credit for having paid Mr. Wagner $32,100 in monthly benefits when, after applying offsets for his other disability benefits, it actually paid him only $5,507.47 per month. And second, in calculating the Principal Sum Amount, Underwriters assumed there would be the same offsets for other disability benefits during the entire 156-month period represented by the Principal Sum Amount, when in fact, some of those supplemental benefits would end when Mr. Wagner reached age 65 or 67.

¶ 60    In our view, none of this matters. Mr. Wagner explicitly agreed to the $5,000,800 Principal Sum Amount. That was spelled out in the policy. We agree with Underwriters that to adjust how that amount was calculated would be an impermissible rewriting of the policy. Neither of these corrections has anything to do with a reasonable manner for calculating how much that lump sum should go up because of the relatively modest increase in Mr. Wagner's earnings in 2016.

¶ 61    Mr. Wagner convinced the trial court here that it did not matter which method of calculating an increased Principal Sum Amount was the fairest or most reasonable, because the court was obligated to strictly construe the ambiguity in the endorsement against Underwriters. According to Mr. Wagner, this required the trial court to use any calculation that was most advantageous to him. Even if we were to view the omission of a formula for calculating an increased Principal Sum Amount as creating an ambiguity, that still required the court to choose among reasonable interpretations of the endorsement. A calculation of the increase that results in a recalculation of the already agreed-to Principal Sum Amount is simply not reasonable. The only reasonable interpretation of the endorsement, in our view, is that Mr. Wagner's increase in earnings should have added an additional $166,608 to the Principal Sum Amount. Those are his damages.

¶ 62                              C. Prejudgment Interest

¶ 63    Finally, Underwriters argues the trial court erred by awarding Mr. Wagner prejudgment

18

interest at a rate of 9% per annum, the rate provided for in sections 357.9 and 357.9a (215 ILCS 5/357.9, 357.9a (West 2024)) of the Code where an insurer has failed to pay benefits under an "accident and health" policy. Underwriters argues the policy here was instead "surplus line insurance" issued "by a company not authorized and licensed to transact business in Illinois" (*id.* § 445(10.5)), and that such insurance is subject only to specific provisions of the Code, not including sections 357.9 or 357.9a (*id.* § 445(12)). It maintains that the applicable interest provision is instead section 2 of the Interest Act (815 ILCS 205/2 (West 2024)), and that no interest is in fact owed under that section because the amount due was not a liquidated amount. The trial court rejected this argument as both forfeited and lacking merit.

¶ 64    We review a finding of forfeiture for an abuse of discretion and will reverse only where the trial court's decision was "arbitrary, fanciful, or unreasonable, or where no reasonable person would adopt the court's view." (Internal quotation marks omitted.) *Kovera v. Envirite of Illinois, Inc.*, 2015 IL App (1st) 133049, ¶ 47. Here, Mr. Wagner clearly sought prejudgment interest under sections 357.9 and 357.9a of the Insurance Code in his proposed findings of fact and conclusions of law, and Underwriters did not challenge the applicability of those sections in its response. Nor did it raise the argument when, on January 17, 2025, the trial court entered its order adopting Mr. Wagner's proposed findings of fact and conclusions of law and directing him to prepare a final judgment order setting out the precise amounts owed. The first time that Underwriters argued that this claim was not subject to sections 357.9 or 357.9a of the Code because the policy was issued pursuant to a surplus line of insurance was in a written objection to Mr. Wagner's proposed final order. Underwriters was, in the trial court's view, "effectively seeking reconsideration without filing a proper motion to reconsider." Because a party may not raise a new legal theory or factual argument in a motion to reconsider (*North River Insurance Co. v. Grinnell Mutual Reinsurance*

19

*Co.*, 369 Ill. App. 3d 563, 572 (2006)), Underwriters had forfeited this issue. We agree with the court and find no abuse of discretion in its treatment of this argument as forfeited.

¶ 65    Although, as Underwriters points out, it did consistently take the position that an award of interest under the Interest Act would be improper because "there was never a liquidated amount to which [Mr. Wagner] claimed to be entitled," it never advanced the argument that it was exempt from the Code's specific interest provisions because of the surplus line exclusion. That new argument needed to be advanced sooner to avoid forfeiture.

¶ 66    The trial court, in addition to finding forfeiture, found that the exemption did not apply. As it noted, the Code provides that a disability policy is an "[a]ccident and health" policy (215 ILCS 5/4(b) (West 2024)) and thus a Class 1 insurance policy, for which unpaid amounts due are entitled to prejudgment interest at a rate of 9% per annum, under sections 357.9 and 357.9a of the Code (*id.* §§ 357.9, 357.9a). Underwriters seeks to avoid this clear statutory language by contending that this particular disability policy was, under section 445 of the Insurance Code (*id.* § 445(10.5)), "surplus line insurance" issued by a company not authorized or licensed to transact business in Illinois and thus not covered by the Illinois Insurance Guaranty Fund.

¶ 67    It bases that argument on a lengthy affidavit of the Risk and Compliance Director for Ark Syndicate Management Ltd., who makes various factual claims about how this specific disability policy was marketed, the import of certain indicia on the face of the policy, and how PIU, as the broker, complied with the statutory "due diligence" prerequisite that it must first attempt to obtain insurance form an authorized insurer. That affidavit was never produced at trial or at any time prior to Underwriters' objections to the final order, and Mr. Wagner disputed much of its contents. This complex factual dispute underscores why waiting to raise this argument based on an exemption for surplus lines of insurance until after trial and after a draft final judgment order had been

20

submitted, resulted in forfeiture.

¶ 68                                    IV. CONCLUSION

¶ 69     For all of the above reasons, we affirm in part and reverse in part the trial court's judgment in favor of Mr. Wagner. We affirm the court's finding that Mr. Wagner was entitled to an increased Principal Sum Amount under the Automatic Benefit Increase Endorsement and its determination that he was entitled to prejudgment interest in the amount of 9% per annum. We reverse the court's award of damages in an amount intended to correct what Mr. Wagner viewed as errors in the calculation of the initial Principal Sum Amount that he clearly agreed to when the policy was issued. Mr. Wagner is, for the reasons stated above, instead entitled to $166,608. We remand to the trial court for the limited purpose of calculating pre- and post-judgment interest on that amount.

¶ 70     Affirmed in part and reversed in part. Remanded with directions.